Joe Dale MURRAY, Appellant,

v.

The STATE of Texas, State.

No. 2–89–233–CR.

Court of Appeals of Texas,
Fort Worth.

Feb. 6, 1991.

Rehearing Overruled March 13, 1991.

David B. Lobingier, Fort Worth, for appellant.

Tim Curry, Dist. Atty., David K. Chapman, and Edwin Youngblood, Asst. Dist. Attys., Fort Worth, for appellee.

Before JOE SPURLOCK, II, FARRIS and DAY, JJ.

## OPINION

DAY, Justice.

Joe Dale Murray appeals his conviction for the offense of aggravated sexual assault. *See* TEX.PENAL CODE ANN. § 22.021 (Vernon 1989).

We affirm.

On December 27, 1986, S.G. arrived at the Arlington Hilton Hotel where she was to stay during the completion of a flight attendant training course. S.G. was assigned to room 1224 and received a card key to that room. The door to S.G.'s room would not open despite her repeated attempts to insert the card key and get the green light on the lock to illuminate. S.G. eventually opened the door, although she was unable to determine whether the door opened because the lock unlocked or because she pushed the door open. After depositing her luggage in the room, S.G. walked across the room, intending to hang up her jacket. She became aware that she was not alone and attempted to exit the room. A white male, whom S.G. identified at trial as Murray, grabbed her, pushed her against the wall, and ordered her to undress. S.G. removed her clothing. Murray, armed with a knife, cut off S.G.'s watch chain and bracelet and touched the insides of her thighs with the knife. Murray then had sexual intercourse with S.G., after which S.G. lost consciousness. After regaining consciousness, S.G. ran out of the room and proceeded to the lobby. S.G.'s wrists and neck had been cut. She was taken by ambulance to Arlington Memorial Hospital where a doctor performed a rape examination. After hearing S.G.'s testimony and considering the evidence presented, the jury convicted Murray. Murray perfected this appeal.

Murray's first point of error asserts that the trial court erred in denying his objection to the court's charge. Specifically, Murray contends that the trial court should have limited the definition of the term "intentionally" to the *results* of his conduct as opposed to the *nature* of his conduct.

The court's charge, in pertinent part, follows:

A person acts intentionally, or with intent, with respect to the *nature* of his conduct or to a *result* of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the *nature* of this conduct or to circumstances surrounding his conduct when he is aware of the *nature* of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a *result* of his conduct when he is aware that his conduct is reasonably certain to cause the *result*. [Emphasis added.]

Now if you find and believe from the evidence beyond a reasonable doubt on or about the 27th day of December, 1986 in Tarrant County, Texas the defendant, Joe Dale Murray, did then and there intentionally or knowingly, by the use of physical force or violence or by threatening to use force or violence which [S.G.] believed said defendant had the present ability to execute and without the consent of [S.G.] who was not the spouse of the said defendant, cause the penetration of the female sexual organ of said [S.G.] by placing his penis in the female sexual organ of [S.G.], and said defendant used or exhibited a deadly weapon, to-wit, a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury in the course of the same criminal episode, then you will find the defendant guilty of the

offense of aggravated sexual assault as charged in the indictment.

Unless you so find and believe from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "not guilty."

 The Court of Criminal Appeals has consistently recognized that Texas Penal Code § 6.03 delineates three "conduct elements" which may be applicable to an offense: the *nature* of the conduct; the *result* of the conduct; and the circumstances surrounding the conduct. *McQueen v. State*, 781 S.W.2d 600, 603 (Tex.Crim.App.1989) (quoting *Lugo–Lugo v. State*, 650 S.W.2d 72, 74 (Tex.Crim.App. 1983)); *Musgrave v. State*, 608 S.W.2d 184, 191 (Tex.Crim.App. [Panel Op.] 1980) (Roberts, J., concurring). An offense may contain any one or more of these "conduct elements" which alone or in combination form the overall behavior which the legislature intended to criminalize, and it is those essential "conduct elements" to which a culpable mental state must apply. When an offense is *only* a "result" or "nature of the conduct" type offense, the court should submit statutory definitions of "intentionally" or "knowingly" which are limited to the respective culpable mental state required. *Saldivar v. State*, 783 S.W.2d 265, 268 (Tex.App.—Corpus Christi 1989, no pet.) (quoting *Bosier v. State*, 771 S.W.2d 221, 225 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd)). Similarly, when an offense is *both* a "result" and a "nature of the conduct" type of offense, with respect to the intent or knowledge required, the trial court should submit complete statutory definitions of "intentional" and "knowingly" so that the jury can consider both the result of the offender's conduct and the nature of his conduct. *Saldivar*, 783 S.W.2d at 267–68.

Murray cites *Alvarado v. State*, 704 S.W.2d 36 (Tex.Crim.App.1985), for his contention that the court's definition of "intentional" was too broad and that such definition should have been limited to the result, rather than the nature, of his conduct. We believe Murray's reliance on *Alvarado* is misplaced. *Alvarado* was a case involving injury to a child pursuant to § 22.04 of the Texas Penal Code. After an exhaustive analysis of the legislative history underlying § 22.04 and Chapter 6 of the Texas Penal Code, the Court of Criminal Appeals determined that injury to a child was a "result" crime. *Alvarado*, 704 S.W.2d at 39. Murray contends that this finding is controlling on all cases governed by Chapter 22 of the Texas Penal Code. We disagree.

Aggravated sexual assault cases have not yet been characterized as either "result" or "nature of the conduct" type offenses. *Saldivar*, 783 S.W.2d at 267. Therefore, we must apply the rule that when an offense is not clearly categorized as either a "result" or a "nature of the conduct" type offense, with respect to the intent and knowledge required, as is the case at bar, the trial court *may* submit statutory definitions of "intentional" and "knowingly" because *both* definitions allow the jury to consider the nature of the offender's conduct *or* the results of his conduct. *Id.*[1] We find that the trial court did not err in denying Murray's request to limit the definition of the term "intentionally" in its charge to the jury. Murray's first point of error is overruled.

Murray's second point of error asserts that the trial court erred in overruling his motion to suppress his in-court identification by S.G. Specifically, Murray claims that S.G.'s identification of Murray was not of independent origin but rather was the result of hypnotically-induced testimony which resulted from unnecessarily suggestive pretrial identification procedures. Murray further contends that the State failed to provide proper safeguards to in-

---

1. The *Saldivar* court ultimately determined that because it could not determine whether an aggravated sexual assault offense was a "result" type offense or a mixture of a "result" and "nature of the conduct" type offense, and because the appellant objected to the inclusion of a "result" reference in the definition of "intentionally" or "knowingly" and not to the inclusion of the "nature of the conduct" instruction, the trial court did not err in including a "result of the conduct" instruction in the charge. *Id.* at 268.

sure that S.G.'s refreshed recollection was reliable.

The record reflects that S.G. was never under the effect of a hypnotic trance. Bruce Thomas, the psychologist enlisted to hypnotize S.G., testified on direct examination as follows:

Q. [By Mr. Youngblood] I apologize for asking you a vague question. What I mean by what happened was, you said you had attempted to go into a hypnosis-based progressive relaxation session. Were you able to hypnotize [S.G.]?

A. I did not feel so. However, I felt that the relaxation in and of itself would be beneficial in order to calm down any kind of emotional impact her experience might have so that she might more objectively recall some material that she had experienced and deleted in some way.

Q. Can you elaborate for the Court what you mean then by this relaxation?

A. I would have to review the tapes to be absolutely sure that's exactly what was done, but that's normally what I do. On progressive relaxation, basically what that is, is it allows them to concentrate on various parts of their body to help them relax as they go deeper into a state of relaxation.

Q. Is that hypnosis?

A. It is an induction that you can use for hypnosis.

Q. In this case was it?

A. I don't think she was ever hypnotized.

Q. Why not?

A. Well, there were several things, one of which was that muscle relaxation wasn't there; the voice tone inflection didn't have any of the slowed-down, lethargic kind of sound, as I recall. Also, I think, if I remember correctly, there were movements that she made, gestures that didn't seem to be the kind of subconscious motor behavior you have. It was more spontaneous, quick, this nature.

I had the impression that just any time if she wanted to she could just get up and leave. You know, it wasn't—I really did not feel that she reached a satisfactory state of hypnosis.

Thomas thereafter discussed his experience, training, guidance, and education with respect to the field of hypnosis. After viewing the videotapes of S.G.'s relaxation sessions, Thomas testified on direct examination as follows:

Q. [By Mr. Youngblood] ... Having had an opportunity now to review both tapes, do you have, both from that opportunity and from your own independent recollection, an opinion to offer the Court about whether or not [S.G.] was in fact under what you have defined for the Court as hypnosis?

A. I believe [S.G.] to be in a heavy state or a good solid state of relaxation. As far as a trance state hypnosis, I do not believe that she reached a trance state of hypnosis.

Q. Was it your intent during either session to influence [S.G.]'s ability to recall a specific face or person? In other words, were you trying to get her to come to some sort of understanding that you had a preconceived notion about?

A. No, sir, there was no specific individual or face I was getting her or leading her to perceive.

Q. Was it your intent to suggest any answers to her?

A. It was not my intent.

Q. You've done this before, but just so we will have a current frame of reference, could you again define for the Court what you mean by hypnosis?

A. Hypnosis is a concentration of attention to a narrow, narrow scope or frame of reference that allows the person to become more suggestible, to take suggestion, to become more unaware of other events going on around them.

Q. Would that hypnosis involve an altered state of consciousness?

A. It would be an altered state of consciousness.

Because the evidence presented at the pretrial hearing clearly and convincingly establishes the fact that S.G. was never placed under hypnosis, Murray's complaint that S.G.'s eyewitness testimony and in-court identification was tainted by hypnosis

necessarily fails. *Connolly v. Farmer,* 484 F.2d 456, 457 (5th Cir.1973). For if S.G. never underwent hypnosis, her identification of Murray was undoubtedly not the product of hypnosis. Murray's motion to suppress the identification was therefore properly overruled. Murray's second point of error is overruled.

■ In his third point of error, Murray asserts that the trial court erred in commenting on the weight of the evidence by instructing the jury to limit its consideration of Murray's exhibits, in violation of Rule 105 of the Texas Rules of Criminal Evidence. We find that Murray waived any error with respect to this matter.

Rule 105 provides, in part, as follows:

(a) When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; ...

TEX.R.CRIM.EVID. 105(a).

The court gave the following instruction before the jury viewed the two videotapes of interview sessions between S.G. and a psychologist enlisted to hypnotize S.G.:

Ladies and gentlemen of the jury, you are about to be shown videotapes of sessions occurring between [S.G.] and Dr. Bruce Thomas. This evidence is submitted to you *for the sole purpose of aiding you, if it does, in deciding whether or not [S.G.] was hypnotized on either occasion.* Further, if you believe that she was hypnotized on either occasion, did Dr. Thomas suggest facts to the subject that resulted in her alleged identification of the Defendant if she did. And thirdly, if facts were suggested, did they in the totality of the circumstances give rise to a substantial likelihood of misidentification of the Defendant. In other words, did the alleged identification of the Defendant as the perpetrator come from facts in her mind, [S.G.], or facts suggested by Dr. Thomas. *And you will not consider the evidence for any other purpose* than those stated. [Emphasis added.]

Murray objected on the ground that the court's instruction was a comment on the weight of the evidence, invaded the province of the jury, and was not "the type of instruction that is called for by Rule 105." Murray claims that the videotapes should have been considered by the jury with regard to the issue of impeachment in addition to its consideration as to the issue of S.G.'s hypnosis. Murray further contends that the court's instruction prohibited the jury from using the tape or its contents to judge S.G.'s credibility.

However, we find that the court's limiting instruction comports with the court's charge to the jury and is substantially similar to that requested by Murray in his "Defendant's Motion for Requested Jury Charge No. 5." Murray cannot request an instruction, have it given in a form substantially similar to that requested by him, and thereafter object to the charge at trial and on appeal. For this reason, Murray's third point of error is overruled.

■ Murray's fourth point of error asserts that the trial court erred in admitting State's Exhibit No. 71A, a printout generated by the lock on room 1224 of the Arlington Hilton Hotel. The State offered the printout as evidence of Murray's entrance into S.G.'s hotel room through the use of a card key prior to her entrance. Murray contends that the printout constitutes hearsay which was not properly authenticated by the State. We find that the evidence offered by the State was *not* hearsay.

■ "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX.R.CRIM.EVID. 801(d). A "declarant" is a person who makes a statement. TEX.R.CRIM.EVID. 801(b). A "statement" is (1) an oral or written verbal expression or (2) nonverbal conduct of a person, if it is intended by him as a substitute for verbal expression. TEX.R.CRIM. EVID. 801(a). The State contends, and we agree, that State's Exhibit No. 71A is not the statement of a person and is not hearsay. As the State so aptly argues:

The printout in this case is unlike many we think of when we consider the general subject of computer printouts. Often, a computer printout amounts to the feeding back of data placed into the computer by a person; although the data may be in different form than it was when it was fed into the computer, it retains its status as the statement or statements made by a person. [Citations omitted.] However, ... the printout in the present case does not fit in that category [because] the results of the computer's internal operations is not hearsay evidence. It does not represent the output of statements placed into the computer by out of court declarants. [Citation omitted.]

In [other analogous cases], the printouts were the result of computer records of telephone traces, but ... the printout in the present case is exactly the same sort of automatic electronic recording device described in these cases. As is the case with telephone traces, the electronic door lock recording device in this case was activated automatically; it was not the reproduction or reorganization of statements entered into the device by a declarant. That is, it was "computer [self-]generated data" rather than "computer stored data." [Citation omitted.]

This distinction between computer stored data, which is clearly hearsay, and computer self-generated data, which ... is not hearsay, is in accord with Rule 801, which requires that a statement by [sic] made by a *person* before it can fall within the definition of hearsay.

We find the State's argument particularly persuasive in light of a recent commentary which directly addresses this point:

Although use of terms of art such as "read" or "say" might lead one to assume that a hearsay problem is present ... it would be incorrect to assume that a hearsay problem is present *anytime* a machine "talks," transmits data, or otherwise communicates information. [Emphasis added.]

....

[C]an a machine, in itself, be a "declarant" and can it make "statements?" The answer to the first question is "no." Mechanical devices, like bloodhounds, are not persons and cannot be "declarants." But they can serve as vehicles for storing or transmitting "statements" made by a "person." Thus, if Officer Jones ... was reading information which had been entered by a person, such as a business ledger or letter, those portions of the hearsay definition dealing with a statement by a declarant would be satisfied. If, however, Officer Jones was reading information which was simply being automatically recorded by the machine, such as climatological data, a hearsay problem is not presented. The mere fact that the same data was ultimately printed in hard copy would not convert it into hearsay.

Schlueter, *Hearsay—When Machines Talk*, 53 TEX.B.J. 1135 (1990).

■ While we conclude that the proffered printout was not hearsay, we must also determine whether the State proved that the printout was reliable. During the trial, the State established that the printout from the door lock of room 1224 came from a small computer that was connected to the door lock after the offense occurred. The door lock was part of a system that used keys similar to credit cards. The lock could be opened by the key given to the room guest or by any one of several master keys possessed by the manager, the cleaning woman, and the maintenance man. Each of these keys had its own code. Whenever a key was inserted in the door lock of a particular room, a memory device inside the lock automatically recorded the approximate time of entry, as well as the code of the particular key that was used to open the door. Thus, when hotel personnel wished to find out who had entered a particular room and when, they could do so by connecting the computer to the door lock, which generated the printout. James Dempsey, the hotel manager, had care, custody, and control of the hotel, its door lock system, the lock on room 1224, and the computer that generated the printout tape from that lock on December 28. Paul Ly-

day, the hotel's chief engineer, prompted the printout in this case.

Although the locking system was new to this particular hotel, it had been previously tested. The hotel encountered some difficulties with the locking system in the weeks immediately after the offense. The trustworthiness of the locks and the printout generated from these locks was the subject of Lyday's testimony on voir dire:

Mr. Beatty: You think those *locks* were trustworthy on December 27th of 1986? [Emphasis added.]

Mr. Lyday: You are asking for an opinion, Counselor.

Mr. Beatty: That's right.

Mr. Lyday: My opinion, no.

. . . .

Mr. Ray: Do you have an opinion as to whether or not these times that were printed out on this receipt as to the operation of the door lock [on] Room 1224 for each of those times, was it—

Mr. Lyday: It would indicate it was working properly.

Mr. Ray: Working properly then.

Mr. Lyday: Yes.

Mr. Ray: Okay. And if somebody entered before or after and it didn't register, *it wasn't the computer part of this lock, then, that was messed up, was it?* [Emphasis added.]

Mr. Lyday: That's correct.

. . . .

THE COURT: Let me ask you this. You said that frankly you didn't think they were trustworthy. In what areas are they not trustworthy? I mean that's a broad statement. Are you talking about what you were just talking about with the counselor, or are they just totally untrustworthy?

Mr. Lyday: Oh, I think they are now, but at that time they weren't.

THE COURT: So there won't be any misunderstanding, in what way are they untrustworthy? Can I have reasonable assurances as a fact finder that on—it's printed this out, that the GM, the master card Number 17 opened this door at 6:00 o'clock on December 23rd. If it prints it, is it reliable?

Mr. Lyday: You can bet money on it.

. . . .

THE COURT: But if it, in your opinion if it printed it, it happened.

Mr. Lyday: That's correct.

Lyday's testimony distinguishes between the reliability of the door locks and the reliability of the computer printout. Lyday stated that the lack of trustworthiness he previously referred to related to the lock's tendency to prevent the door from shutting properly. However, Lyday's subsequent testimony related that the lock was trustworthy with respect to the information which appeared on the computer printout. The trial court found that the printout process was "scientifically reliable enough for the jury to rule on whether or not it's of any value to them in this particular case." We find that the State adequately proved the reliability of the computer printout. Because Murray's objection is based on the premise that State's Exhibit 71A is hearsay, and because the State proved the trustworthiness of the printout, we overrule his fourth point of error.

■ Murray's sixth point of error contends that the trial court erred in permitting S.G. to testify at the punishment phase of the trial concerning her medical disabilities, medical problems, physical and mental losses, and emotional scarring and healing. Murray claims that this testimony is beyond the scope of permissible testimony at a punishment hearing because evidence appropriate at such a hearing is limited to Murray's past criminal record, character, and reputation.

At the punishment phase, the State declared that it intended to recall S.G. to the stand in order to ask her about any post-assault effects she incurred. S.G. testified about the effects of the offense in the following respects: the nature and length of her medical treatment; the disruption of her professional career; and the emotional and physical scars she continued to carry as a result of the assault. The Court of Criminal Appeals has recently held that this type of testimony is admissible at the punishment phase of a non-capital trial in

*Miller–El v. State,* 782 S.W.2d 892 (Tex. Crim.App.1990). The court rejected the Court of Appeals' holding that because the testimony amounted to "a medical forecast of the victim's future health" rather than "an assessment of injuries on the occasion in question," such evidence was unrelated to any issue at the punishment phase of the trial and "clearly calculated to inflame the minds of the jury." *Id.* at 893. The court summarily held that testimony regarding future hardships that the victim would suffer was admissible at the punishment phase of a non-capital prosecution as evidence regarding the "circumstances of the offense," so long as the factfinder could rationally attribute moral culpability to the accused for that injury. *Id.* at 895.

In the present case, Murray was the only actor and unquestionably either intended or should have anticipated the results testified to by S.G. In either case, Murray was blameworthy. *Id.* at 897. Thus, the jury was entitled to hear and consider S.G.'s testimony. The trial court did not err in permitting her testimony. Murray's sixth point of error is overruled.

■ Murray's fifth point of error contends that the evidence is insufficient to sustain his conviction. We disagree. In reviewing the sufficiency of the evidence to support a conviction, the evidence is viewed in the light most favorable to the verdict. *Human v. State,* 749 S.W.2d 832, 834 (Tex. Crim.App.1988); *Jackson v. State,* 772 S.W.2d 575, 577 (Tex.App.—Fort Worth 1989, pet. ref'd). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984); *Brady v. State,* 771 S.W.2d 734, 735 (Tex.App. —Fort Worth 1987, no pet.). The sufficiency of the evidence is a matter of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defendant's evidence "outweighs" the State's evidence. *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). If there is evidence which establishes guilt beyond a reasonable doubt, we are not in a position to reverse the judgment on sufficiency of the evidence grounds. *Id.*

The record reflects that S.G. identified Murray in a photograph spread, a lineup, and in person at trial. Photographs of the physical evidence taken from the scene of the offense—clothing, shoulder bag, undergarments, curler, bracelet, and other personal items—corroborate not only her proximity in the room at the time of the offense but also her description of the incident. S.G. also identified, for demonstrative purposes only, the kind of knife held by Murray during the offense. S.G. testified with regard to the following facts: she went into her room and initially took no notice of anyone else's presence; she became aware of some movement near the bathroom shortly thereafter; Murray grabbed her, prevented her from leaving, and slammed her head against the wall; Murray threatened to hurt her if she did not cooperate and indicated that he had a knife to help him enforce his threats; Murray later put the knife to her throat; as a result of Murray's violent and threatening conduct, she agreed to have sexual intercourse with him against her will; Murray committed the sexual act with her; and after regaining consciousness, she ran from the room and made an outcry in the hotel lobby.

Additional evidence and testimony related that Murray's fingerprints were located on the outer surface of the clear glass mirrored doors on the closet of S.G.'s hotel room, the edge of the bathroom sink near the counter, the edge of the tub, and the toilet seat lid top. Murray's fingerprints were also obtained from the computer coded room key. A police officer testified that the fingerprints collected in the hotel room matched those obtained from the computer card. Coupled with the printout previously discussed, which represented a recordation of Murray's entrance into S.G.'s hotel room, we find there was sufficient evidence to support Murray's conviction. Murray's fifth point of error is overruled.

The judgment of the trial court is affirmed.