# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00218-CR

**Harold Miller, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT NO. 3030798, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Harold Miller guilty of capital murder in the course of committing or attempting to commit robbery. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West Supp. 2005). The State did not seek the death penalty, and the district court assessed punishment at life imprisonment. Appellant contends the trial court erred by: (1) admitting evidence seized during a warrantless search of his bedroom; (2) admitting cell phone billing records that were not properly authenticated, were hearsay, and violated his confrontation rights; (3) admitting custodial statements obtained in violation of the United States Constitution and state statute; (4) admitting a recording that was not properly authenticated; (5) refusing to quash the indictment; and (6) refusing to instruct the jury on the lesser included offense of murder. We find no reversible error and affirm the judgment of conviction.

## BACKGROUND

The deceased, seventy-five-year-old Glenn Ragland, bought and sold used cars. Appellant, an automobile mechanic, often worked on Ragland's personal cars and on the cars he purchased for resale. At the time of the murder, appellant was living with his mother and stepfather in an Austin trailer park.

On the morning of April 24, 2003, appellant called his former girlfriend, Carolyn Rountree Lester, and told her that he was thinking about raising some money, paying the debt he owed her, and leaving Austin. The next day, appellant called Lester again and told her that he had obtained a loan. She testified that appellant asked her to go to a nearby Dodge dealership and get a check from a friend of appellant who worked there, Chris Taylor. Following appellant's instructions, Lester went to the dealership and met Taylor, who gave her a check for $2500 payable to her and purportedly drawn by Ragland on April 24. The check bore the notation "loan."

There is no question that this check was forged. A handwriting expert who compared the writing on the check with known samples testified that the check was not written by Ragland, the purported payor, or by Lester or Taylor.[1] The expert was also of the opinion that the check had not been written by Gerald Westmoland, another person who was with appellant during part of the afternoon in question. The expert testified that the check "may have" been written by appellant.

Lester took the check to the bank on which it was drawn, endorsed and cashed it, and returned to the dealership. As she had been told to do by appellant, Lester gave $1800 to Taylor and kept the rest for herself.

---

[1] The expert's analysis confirmed Lester's testimony that she endorsed the check.

2

Taylor testified that appellant called him at work on the afternoon of April 25 and asked if he could drop off a check for Taylor to give to Lester. A few minutes later, appellant called Taylor again and told him he was in the dealership's parking lot. Taylor walked outside and found appellant alone in a car shown by other evidence to have been Ragland's. Appellant handed the $2500 check to Taylor and told him that it was the proceeds of a loan against his truck. Taylor testified that after Lester came to the dealership and took the check, appellant called him again and told him that Lester would be returning with the cash. Taylor agreed to hold the cash for appellant, who came to the dealership to get it later that evening.

Gerald Westmoland was a mechanic who lived in the same trailer park and had worked with appellant on some of his jobs for Ragland. Westmoland testified that appellant called him on the afternoon of April 25 and asked him if he would like to make $500. Westmoland told appellant that he would. Appellant arrived at Westmoland's trailer about forty-five minutes later, driving a car Westmoland recognized as Ragland's. Westmoland said that he assumed appellant was test-driving it. After stopping for food and gasoline, appellant drove to the Dodge dealership, where Westmoland waited in the parts department while appellant spoke to someone in another part of the building.

After leaving the dealership, appellant showed Westmoland the cash, saying it was a loan. Appellant asked Westmoland if he had ever killed someone and offered him $500 to help him bury a body. Westmoland said that he thought that appellant was joking. Appellant also asked Westmoland if he would cash a check for him and showed Westmoland a blank check from

3

Ragland's account. During this conversation, appellant told Westmoland that he "hit some little old man over the head with a fire extinguisher."

Appellant and Westmoland returned to appellant's trailer to watch a movie. Appellant's mother and stepfather were not there. Appellant went into a bedroom and called for Westmoland. When Westmoland entered the room, he saw what appeared to be a body lying on the floor under a blanket. He testified, "I was just in there for like a second and turned around and came back out. I thought it was his girlfriend hiding under a blanket or something." He added, "I thought they were trying to play a joke on me or something." Westmoland testified that he and appellant returned to the living room, watched television, and smoked crack. Appellant told Westmoland that he planned to go to a hotel later that evening and mentioned "getting into a gun fight with the police . . . . He said he was either going to have a shootout with them or he was going to get a gun and shoot himself." After a half-hour or so, when no one came out of the bedroom and he heard no noise, Westmoland got a "weird feeling," made an excuse to leave, and walked to his mother's trailer. Later that night, Westmoland made an anonymous call to Crime Stoppers and reported that a body was in appellant's trailer.

Detective Kerry Scanlon and his partner were dispatched to the trailer at about 10:00 p.m. to investigate the report of a body. They were met at the door by appellant's stepfather, Roy James, who gave the officers permission to search the trailer. Ragland's body was found wrapped in a blanket on the floor of appellant's bedroom. His hands were bound by cable ties. A bag of these ties was later found in the living room of the trailer, as was a fire extinguisher that was dented and covered with Ragland's blood. The medical examiner testified that Ragland died as a result of a

4

"crushed head, broken neck and fractured clavicle due to multiple blunt trauma to the head, back and chest."

The officers located Westmoland at about 1:00 a.m. that night and he agreed to go with them to the police station to make a statement. When Westmoland told the officers what appellant had said about going to a hotel, they began driving through the parking lots of area motels and hotels. At about 2:00 a.m., Westmoland spotted Ragland's car in the parking lot of a Motel 6. After learning that appellant had rented a room at the motel, the officers contacted him by telephone. Appellant was alternately angry and upset. He told the officers that he was sorry for what he had done and that he had unsuccessfully tried to kill himself with a knife. Appellant made several similar calls to Lester, Taylor, and Westmoland's mother. Appellant eventually surrendered to the police at 5:45 a.m. During a subsequent search of the motel room, officers found Ragland's wallet, keys, and cell phone, and $1600 in cash. In Ragland's car, police found Ragland's checkbook and a blank certificate of title. Ragland's blood was found on the steering wheel.

## DISCUSSION

**Bedroom search**

Detective Scanlon and his partner did not have a search warrant when they went to appellant's trailer to investigate the report of a body in the bedroom. They did, however, obtain written consent to search the trailer from appellant's stepfather, James. Appellant contends that James was not authorized to consent to a search of appellant's bedroom, and that the initial search of that room that resulted in the discovery of the body violated the Fourth Amendment prohibition against unreasonable searches and seizure. *See* U.S. Const. amends. IV, XIV. In a separate point

5

of error, appellant urges that the search violated his rights under the Texas Constitution. *See* Tex. Const. art. I, § 9. Based on these alleged constitutional violations, appellant contends that the trial court erred by overruling his motion to suppress evidence seized during the search. In our review of the trial court's ruling, we defer to the court's factual determinations but review de novo the court's application of the law to the facts. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

Consent to search is an established exception to the Fourth Amendment warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). It is not always necessary that consent be given by the party asserting the constitutional violation. Permission to search may also be given by a third party who possesses common authority over or other sufficient relationship to the premises or effects to be searched. *United States v. Matlock*, 415 U.S. 164, 171 (1974).

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id*. at 171 n.7. Another way of saying this is that a third party may properly consent to a search when the party has equal control over and equal use of the premises to be searched. *Becknell v. State*, 720 S.W.2d 526, 528 (Tex. Crim. App. 1986); *Riordan v. State*, 905 S.W.2d 765, 770 (Tex. App.—Austin 1995, no pet.).

If in retrospect the facts do not support a finding of actual authority, a search is nevertheless reasonable if the third-party consent-giver *apparently* had authority to consent. *Illinois*

6

*v. Rodriguez*, 497 U.S. 177, 188 (1990); *McNairy v. State*, 835 S.W.2d 101, 105 (Tex. Crim. App. 1991); *Riordan*, 905 S.W.2d at 771. Officers may not take a third party's claim of common authority at face value when the circumstances are ambiguous or if the claimed authority appears to be unreasonable, and in such cases the officers may not proceed without making a further inquiry. *Riordan*, 905 S.W.2d at 771. But if the facts available to the officers warrant a person of reasonable caution in the belief that the consenting party has authority over the premises, the search is constitutional. *Rodriguez*, 497 U.S. at 188-89.

The Supreme Court has recently written that the "constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations . . . ." *Georgia v. Randolph*, No. 04-1067, 2006 U.S. LEXIS 2498, at *15 (U.S. Mar. 22, 2006). *Matlock* "stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interest." *Id*. at *15-16. Co-inhabitants "understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. As *Matlock* put it, shared tenancy is understood to include an 'assumption of risk,' on which police officers are entitled to rely . . . ." *Id* at *16. *Matlock* "placed no burden of the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place." *Id*. at *17.

Scanlon testified at the suppression hearing that James told him that "he owned the trailer and that he [James] could go wherever he wanted." With specific reference to the room where the body was found, Scanlon testified that James told him that the appellant slept in the room, that

7

appellant's mother also used the room, and that James also went into the room. Scanlon's partner, Sergeant Hector Reveles, testified to the same effect.

Scanlon testified at trial that James invited the officers into the trailer after being told why they were there.[2] After James signed the consent form, Scanlon quickly walked through the kitchen, dining area, and other rooms to the left of the front door. Finding no one else in that part of the trailer, Scanlon returned to the living room and asked James if appellant was at home. James said he was not. The officers then asked James to check appellant's bedroom to make sure he was not there. James went to the room to the right of the front door, lifted the sheet hanging in the doorway in lieu of a door, and "flipped the light on and flipped it off, almost as quick as I am describing it to you." Scanlon testified, "I was going to ask him if he would actually go in and check, look in the room and Sergeant Reveles asked him to turn the light on." James reentered the bedroom, held the curtain open, and turned on the light. Scanlon testified that he and Reveles were standing "outside the bedroom but at the door" when James turned on the light. Scanlon could see that, like the rest of the trailer, the room was cluttered. He said, "There was a bed that was basically in the middle of the bedroom and I saw a blanket on the floor that appeared to be wrapped over something." Scanlon noticed blood on the floor beside the blanket. James bent down and "grabbed like a corner of the blanket and jerked it up with his hand toward the bed and then he jumped back when he saw that underneath the blanket was the body."

---

[2] In their briefs to this Court, both appellant and the State refer to the trial testimony in addition to the testimony at the suppression hearing. Accordingly, we will do the same.

8

The officers ordered James to leave the room. After satisfying themselves that the person on the floor was dead and that there was no one else in the bedroom, the officers cleared the trailer and closed it. They obtained a warrant before reentering the trailer and conducting a more thorough search. The body was later identified as being that of Glenn Ragland.

Appellant cites the opinion in *United States v. Whitfield*, 939 F.2d 1071 (D.C. Cir. 1991), to support his claim that James was not authorized to consent to the search of appellant's bedroom. In that case, the defendant's mother consented to the search of her adult son's unlocked bedroom. *Id*. at 1073. The court held that the mother's ownership of the premises, her legal right to enter the bedroom, and the parent-child relationship did not support a reasonable belief that she had the authority to permit the search of the bedroom. *Id*. at 1075.

Whether or not *Whitfield* reflects a proper understanding of *Matlock* and *Rodriguez*, the cause before us is distinguishable. In addition to asserting his ownership of the trailer, appellant's stepfather told the officers that appellant's mother used the bedroom in which appellant slept and that he, James, also went into the room. The room did not have a door, but only a sheet hanging in the doorway. Scanlon testified that there were gaps on the sides of the curtain through which one could see into the bedroom. We conclude that the facts known to the officers reasonably warranted the belief that the bedroom in question was part of the common area of the trailer mutually used by the residents, and that James's consent to search the trailer extended to the bedroom. Finding no Fourth Amendment violation, we overrule point of error five.

In a separate point of error, appellant urges that the initial search of his bedroom violated article I, section 9 of the Texas Constitution. Section 9 does not contain a general warrant

9

requirement, and a search or seizure that is otherwise reasonable does not offend section 9 because it was not authorized by a warrant. *Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998). The absence of a warrant requirement does not mean that consent is irrelevant to a section 9 analysis. Logic and case law suggest that a search conducted with the voluntary consent of a person authorized to give it is reasonable under section 9. *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).

Appellant's section 9 argument is essentially the same as his Fourth Amendment argument: James was not authorized to consent to the search of appellant's bedroom. For the reasons previously discussed, we hold that the officers reasonably believed that James had the authority to permit them to search. Because the officers' belief in James's apparent authority was reasonable, it follows that the search was reasonable under section 9. Point of error six is overruled.

**Cell phone records**

State exhibit eighteen is a cell phone bill dated May 16, 2003, and addressed to Glenn Ragland. Ragland's daughter, Brenda Morgan, identified the bill and said that she gave it to the police. She also testified that the bill accurately reflects the date and time of two calls, one she made to Ragland and one he made to her, on April 25, 2003. The bill documents a total of one hundred sixty-six phone calls made to or from Ragland's cell phone during the billing period, showing the date, time, and duration of each call, and, for the outgoing calls, the number called. Portions of this bill were enlarged and admitted as State exhibits twenty-one through twenty-three. Several witnesses identified their own telephone numbers as being among those called. In this way, the exhibits were used to show that Ragland's cell phone was used to make seven calls to Westmoland

10

and Taylor between 2:27 p.m. and 4:17 p.m. on April 25. The exhibits were similarly used to show that appellant used Ragland's cell phone during the early morning hours of April 26 to call Westmoland, Taylor, Lester, and Ragland's family.

Appellant contends that the phone bill was hearsay and that the admission of the bill and the enlargements denied him his Sixth Amendment confrontation right. He also asserts that the phone bill was not properly authenticated. The State concedes that each of appellant's contentions was preserved by an objection and adverse ruling at the time the exhibits were offered and admitted. Nevertheless, the State urges that appellant failed to preserve his contentions for appeal because he did not repeat his objections each time that a witness was shown the exhibits and asked to identify his or her telephone number among those listed. The State relies on the general rule that in order to preserve an error in the admission of evidence, a party must object each time the evidence is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991).

The continuing objection rule does not apply when the other evidence proving the same facts is not subject to the same objection. *Matz v. State*, 14 S.W.3d 746, 747 (Tex. Crim. App. 2000). In *Matz*, the court held that the defendant did not forfeit his hearsay objection to the admission of the victim's videotaped interview by failing to object to the victim's trial testimony. *Id*. The court observed that the objection to the videotape went to its form, not its substance, and that the defendant could not be expected to voice a hearsay objection to the victim's trial testimony. *Id*. Similarly, appellant did not object to the substance of the cell phone bill but to its form. None of the objections he voiced to the introduction of the bill applied to the in-court testimony of the witnesses who identified their telephone numbers. Appellant's contentions are properly before us.

11

Appellant's hearsay and authentication contentions are interrelated. He asserts that the phone bill was an out-of-court statement offered to prove that certain calls were made on Ragland's cell phone, and thus the bill was hearsay. *See* Tex. R. Evid. 801(d) (defining hearsay). In order to invoke the business records exception, which appellant argues is the only applicable hearsay exception, it was necessary for the State to lay the necessary predicate through the testimony or the affidavit of the records custodian or other qualified witness. *See* Tex. R. Evid. 803(6) (business records exception), 902(10) (self-authenticating business records). Because the cell phone bill was not authenticated by either method, appellant urges that the trial court erred by overruling his hearsay objection and admitting the bill in evidence. *See Venable v. State*, 113 S.W.3d 797, 799-801 (Tex. App.—Beaumont 2003, pet. ref'd) (holding that "certificate" attached to cell phone bill did not satisfy rule 902(10)).

In response, the State does not contend that it laid the necessary predicate for the admission of the cell phone bill as a business record. Instead, the State asserts that the phone bill was not hearsay at all. The State relies on opinions recognizing a distinction between printouts of data placed into a computer by a person ("computer stored data") and printouts of data generated by the internal operations of a computer itself ("computer self-generated data"). *See Murray v. State*, 804 S.W.2d 279, 284 (Tex. App.—Fort Worth 1991, pet. ref'd). This Court and other Texas courts of appeals have recognized that computer self-generated data is not hearsay because there is no human declarant. *See Henderson v. State*, 14 S.W.3d 409, 412 (Tex. App.—Austin 2000, no pet.) (intoxilyzer); *Stevenson v. State*, 920 S.W.2d 342, 343-44 (Tex. App.—Dallas 1996, no pet.) (intoxilyzer); *Ly v. State*, 908 S.W.2d 598, 600-01 (Tex. App.—Houston [1st Dist.] 1995, no pet.)

12

(electronic monitor); *Murray*, 804 S.W.2d at 284-85 (computerized hotel lock system); *Burleson v. State*, 802 S.W.2d 429, 439-40 (Tex. App.—Fort Worth 1991, pet. ref'd) (computer-generated report of payroll records deletions). The admissibility of such records is determined by the reliability and accuracy of the computer process involved. *See Ly*, 908 S.W.2d at 600-01; *Murray*, 804 S.W.2d at 284-85; *Burleson*, 802 S.W.2d at 439-40.

Although there does not appear to be any Texas opinion treating a telephone bill as a computer self-generated document, the State refers us to two opinions from other jurisdictions that do. *See State v. Dunn*, 7 S.W.3d 427, 432 (Mo. Ct. App. 1999); *State v. Hall*, 976 S.W.2d 121, 146-47 (Tenn. 1998). In both cases, however, a qualified witness described the computerized system by which the telephone billing record was generated and vouched for the reliability of that system. *Dunn*, 7 S.W.3d at 431; *Hall*, 976 S.W.2d at 147. In the instant case, there is no testimony from a qualified witness that the telephone bill at issue was a printout of computer self-generated data. In fact, it appears that this theory of admissibility is being urged by the State for the first time on appeal, and the State is essentially asking this Court to take judicial notice of the fact that telephone billing records are today generated by computers without human input.[3]

At least one appellate court has taken judicial notice that a cell phone bill is a printout of computer self-generated data. *See State v. Carter*, 762 So. 2d 662, 680 (La. Ct. App. 2000) (stating that cell phone bills "are obviously computer-generated printouts of the computer-recorded numbers of telephone calls"). On the other hand, the court of criminal appeals has recently written,

---

[3] At trial, neither the State nor the court articulated the basis for the exhibit's admission.

regarding the admission of scientific testimony under rule 702, that "judicial notice on appeal cannot serve as the sole source of support for a bare trial court record concerning scientific reliability." *Hernandez v. State*, 116 S.W.3d 26, 31-32 (Tex. Crim. App. 2003); *see* Tex. R. Evid. 702. Moreover, even if we were to accept the State's assertion that the telephone bill in question is a computer self-generated printout, Morgan's testimony identifying two of the one hundred sixty-six phone calls it documents is not sufficient to establish the accuracy of the process by which the bill was generated. On this record, the trial court erred by admitting the cell phone bill over appellant's hearsay objection.

Appellant contends that because the State failed to demonstrate that the phone bill fell within a firmly rooted hearsay exception, its admission in evidence violated his Sixth Amendment confrontation right. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980); *Porter v. State*, 578 S.W.2d 742, 746 (Tex. Crim. App. 1979). The State counters by asserting that *Roberts* is no longer good law, and that the Confrontation Clause does not apply to nontestimonial hearsay such as the phone bill in question. Alternatively, the State urges that the phone bill was shown to be sufficiently trustworthy to satisfy the Sixth Amendment.

In *Roberts*, the Supreme Court held that the admission of hearsay in a criminal prosecution does not violate the defendant's Sixth Amendment confrontation right if the evidence bears sufficient indicia of reliability. 448 U.S. at 66. Such reliability can be shown by the presence of a firmly rooted hearsay exception or some other particularized guarantee of trustworthiness. *Id*.; *see also White v. Illinois*, 502 U.S. 346, 356 (1992). Recently, the Supreme Court reexamined its Confrontation Clause jurisprudence, criticized the *Roberts* reliability test, and announced a new test

for determining the admissibility of testimonial statements under the Sixth Amendment. *Crawford v. Washington*, 541 U.S. 36, 60-61, 68 (2004). *Crawford* suggests, but does not hold, that the Confrontation Clause applies only to testimonial statements, and that the admission of nontestimonial statements is regulated solely by hearsay law. *Id*. at 61, 68. This Court has stated that until the Supreme Court clarifies this point, "the *Roberts* line of cases seem to be alive and well as to nontestimonial hearsay." *See Davis v. State*, 169 S.W.3d 660, 668 (Tex. App.—Austin 2005, pet. filed).

The State argues that the phone bill was sufficiently trustworthy under *Roberts* because it is a computer self-generated document. For the reasons we have already discussed, we are not prepared to accept this assertion, for which there is no support in the record. We therefore conclude that the admission of the cell phone bill over appellant's Sixth Amendment objection was constitutional error. Under the applicable harmless error rule, we must reverse the conviction unless we are satisfied beyond a reasonable doubt that this error did not contribute to the conviction. Tex. R. App. P. 44.2(a); *see Simpson v. State*, 119 S.W.3d 262, 269 (Tex. Crim. App. 2003).

The phone bill reflects that Ragland used his cell phone to call his daughter at 1:02 p.m. on the day of the murder. Morgan testified that her father told her in this call that he had something to do "up north." The next three calls documented by the bill were to appellant's trailer at 1:42, 2:02, and 2:05 p.m. The State argued to the jury that it was reasonable to infer that Ragland made these calls to set up a meeting with appellant to discuss a job. The next call was made at 2:27 p.m. to Westmoland's residence. The State argued that this call must have been made by appellant. From this, the State inferred that the murder was committed between 2:05 and 2:27, and that

15

Westmoland was not a party to the murder because appellant would have had no reason to call Westmoland if he had been present when Ragland was killed. Citing this argument, appellant contends that the admission of Ragland's cell phone bill harmed him in two respects: (1) by corroborating Westmoland's testimony and eliminating him as a participant in the murder, and (2) by establishing that the murder was committed before he was seen driving Ragland's car and before he gave the forged check to Taylor, and thus to prove that the murder was committed in the course of a robbery.

We are satisfied that the admission of the exhibit did not contribute to appellant's conviction even if the jury drew from the telephone bill the inferences urged by the State. If Westmoland had been shown to be a party to Ragland's murder and thus an accomplice witness, there clearly was other evidence connecting appellant to the offense—Ragland's body was found in appellant's bedroom—and thus to corroborate Westmoland's testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1995) (accomplice witness rule). As for the robbery element, Taylor saw appellant alone and driving Ragland's car on the afternoon of the murder. At this time, appellant gave Taylor the forged check drawn on Ragland's account. Appellant was in possession of Ragland's car, checkbook, cell phone, and wallet when he was arrested. He also had $1600 in cash, which the jury could reasonably infer was the proceeds from the forged check. Given the wealth of other robbery evidence, we are satisfied beyond a reasonable doubt that the admission of the cell phone bill did not contribute to appellant's conviction for capital murder.

Points of error one, two, and three are overruled.

16

**Statements to police**

Between 2:00 a.m. and his surrender to the police at 5:45 a.m., appellant had several telephone conversations with police officers from his motel room, some initiated by the police and some initiated by appellant. During these calls, appellant told the officers that "he was sorry" but did not indicate what he was sorry for, asked to speak to his stepfather to apologize for some unspoken reason, and asked to speak to Lester to say good-bye. Appellant told the officers that he had tried to kill himself by cutting his throat but his knife was too dull, and he said that he would shoot himself if he had a firearm. Appellant contends that these statements should have been suppressed because they were obtained in violation of his Fifth Amendment rights and the requirements of article 38.22, section 3. *See Miranda v. Arizona*, 384 U.S. 436 (1966); Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West 2005).

*Miranda* and article 38.22 apply only to statements made during custodial interrogation. *Miranda*, 384 U.S. at 478 (volunteered statements not barred by Fifth Amendment); Tex. Code Crim. Proc. Ann. art. 38.22, § 5 (statute does not preclude admission of statement that does not stem from custodial interrogation).[4] Appellant notes that his motel room was surrounded by police who had probable cause to arrest him and who were demanding that he surrender. He urges that a reasonable person under these circumstances would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996).

---

[4] Appellant does not contend that "custodial interrogation" has a different meaning under article 38.22 than under *Miranda*.

Assuming without deciding that this is true, appellant does not refer us to any evidence that the officers said or did anything calculated to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation"); *Jones v. State*, 795 S.W.2d 171, 176 (Tex. Crim. App. 1990) (same). Absent a showing that the challenged statements were the product of custodial interrogation, the trial court did not err by refusing to suppress them. *See Saldivar v. State*, 980 S.W.2d 475, 490 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (holding defendant's statements to police negotiators during parking lot standoff were not product of custodial interrogation). Points of error seven and eight are overruled.

**Voice mail recording**

At about 4:00 a.m. on April 26, appellant called Ragland's residence from his motel room. Morgan testified that she answered this call, that appellant identified himself, and that he told her, "I'm sorry. I'm sorry. I'm so sorry." A police officer was at Ragland's house when this call was received and was able to record the last portion of it. This recording was introduced in evidence as State exhibit 20A. Appellant called back thirty minutes later. He was crying and repeatedly said, "I'm sorry." The officer recorded this call, and it was introduced in evidence as State exhibit 20B. Appellant does not complain of the introduction of these recordings.

Appellant's point of error is directed to the admission of a third recording, State exhibit 20D. The exhibit was admitted in evidence at the close of the State's evidence, after Morgan was recalled and asked if she could identify the voice in the recording. She said that she recognized the voice as appellant's. Neither Morgan nor any other witness, however, identified the recording

18

or explained the circumstances in which it was made. We learn only from statements made by counsel outside the jury's presence that this was a voice mail message left on appellant's step-father's phone. We agree with appellant's contention that exhibit 20D was not properly authenticated. *See* Tex. R. Evid. 901(a).

The erroneous introduction of exhibit 20D did not affect appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). Appellant's statements in the voice mail message are essentially identical to the statements he made to Morgan in the recordings properly introduced as exhibits 20A and 20B. Given the manner in which exhibit 20D was admitted, the jury probably believed that it was a recording of yet another phone call to Ragland's residence. Because we are satisfied that the introduction of the recording did not harm appellant, we overrule point of error ten.

**Motion to quash**

The indictment alleged that appellant intentionally murdered Ragland "in the course of committing and attempting to commit the offense of robbery of Glenn Ragland." *See* Tex. Pen. Code Ann. § 19.03(a)(2). Appellant contends the trial court should have granted his motion to quash the indictment on the ground that it did not describe the property that was the object of the robbery or attempted robbery.

Appellant concedes that in prosecutions for capital murder in the course of committing a felony, it is not necessary for the indictment to allege the constituent elements of the underlying felony. *See Hammett v. State*, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979) (capital murder in course of robbery). Appellant argues that in this case, however, he could not prepare a defense without being told the specific robbery he was charged with committing, and that in the

19

absence of such an allegation it was impossible to distinguish between the offense for which he was on trial and extraneous offenses.

Appellant's argument is premised on the mistaken assumption that in a prosecution for robbery, each item of stolen property constitutes a separate incident or offense, and that the State can be required to elect which incident to prosecute. In a slightly different form, this argument was presented to and rejected by the court of criminal appeals soon after the current penal code was adopted. In *Hill v. State*, 568 S.W.2d 338, 338 (Tex. Crim. App. 1978), a robbery defendant contended that because the indictment did not allege the property taken, he was not given notice of the offense charged. The court wrote:

> The appellant's argument that the indictment was insufficient to put him on notice of the offense with which he was charged and was insufficient to permit him to later plead the judgment in bar of prosecution for the same offense we find to be without merit. *Even if a motion to quash the indictment had been timely filed and urged*, the indictment, which alleges the name of the person whom it is alleged the appellant robbed, gives sufficient notice without particularly describing the property he allegedly took or intended to take in the course of committed theft.

*Id*. at 339 (emphasis added).

The evidence in this cause shows that appellant stole Ragland's car, wallet, cell phone, check book, and $2500. This does not mean that appellant committed five robberies. Instead, he committed one robbery in which he stole five items of property. Appellant cites no authority supporting his contention that the State was required to elect and allege only one item of stolen property on which to base its prosecution. Point of error nine is overruled.

**Lesser included offense**

Appellant contends that the trial court erred by refusing to instruct the jury on the lesser included offense of murder. It is undisputed that murder is a lesser included offense of capital murder. *See Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004). Thus, the question presented is whether there is some evidence that would permit a rational jury to find that appellant was guilty only of murder. *Id.* In other words, is there evidence supporting a rational finding that appellant did not form the specific intent to obtain or maintain control of Ragland's property either before or during the commission of the murder? *See Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999).

Appellant notes that Ragland's car did not bear signs of a forced entry, and he points to Westmoland's testimony that he did not think it unusual for appellant to be driving Ragland's car on the afternoon of April 25. He also refers to evidence that there was a blank certificate of title in Ragland's car. Appellant asserts that the jury could have rationally found that Ragland gave appellant permission to use his car, either to perform some repair or in anticipation of appellant purchasing it. Appellant also points to testimony that appellant told Lester and Taylor that the $2500 check was a loan. He notes that the check was dated April 24 and bore the notation "loan." Appellant urges that this evidence rationally supports a finding that Ragland loaned him the $2500.

Evidence that Ragland gave appellant permission to temporarily drive his car, either for the purpose of a repair or in anticipation of purchase, is not evidence that appellant lacked the specific intent to steal the car when he murdered Ragland. Appellant's argument that the $2500 check might have been a loan from Ragland is even less persuasive, since it ignores the

21

uncontradicted evidence that the check was a forgery. It also fails to account for appellant's possession of Ragland's checkbook and Westmoland's testimony that appellant asked him if he would be willing to pass one of these checks.

There is no evidence in the record that rationally supports a finding that appellant murdered Ragland and then, as an afterthought, decided to steal Ragland's car, cell phone, and wallet, and to forge checks on Ragland's bank account. The only rational conclusion supported by this record is that appellant murdered Ragland in the course of committing robbery. The trial court did not err by refusing the lesser included offense instruction. Point of error four is overruled.

## CONCLUSION

The judgment of conviction is affirmed.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: April 6, 2006

Publish

22