**Affirmed in Part as Modified, Reversed and Remanded in Part, and Opinion filed June 25, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00891-CV

**TEXAS EAR NOSE & THROAT CONSULTANTS, PLLC, JOSEPH EDMONDS, NEWTON DUNCAN, AND JAMES ALBRIGHT, Appellants**

**V.**

**JOHN K. JONES, M.D., Appellee**

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2010-11470**

## O P I N I O N

These consolidated cross-appeals stem from the departure of one member, John Jones, from a closely-held medical practice, Texas Ear Nose & Throat Consultants, PLLC (TENT). Jones sued TENT and the other members, Joseph Edmonds, Newton Duncan, and James Albright, alleging, principally, breach of the agreements between them, shareholder oppression, and denial of access to the practice's books and records. TENT and the other members counter-claimed against Jones for breach of contract.

Based on an extensive jury verdict, the trial court awarded each side breach of contract damages and related attorney's fees, awarded Jones additional attorney's fees on his claim seeking access to books and records, and ordered the other members to buy out Jones's membership as a remedy for shareholder oppression, although at half the value determined by the jury as the value of his interest.

In their appeal, appellants (TENT and the other members) raise eight issues. The first three challenge the legal and factual sufficiency of the evidence to support the jury's findings that TENT breached Jones's employment agreement (issue one), Jones was entitled to $374,694.01 in "ancillary income" due to the alleged breach (issue two), and Jones's own breach of the agreement was excused (issue three). In issue four, appellants contend that the jury finding that Jones was still a member of TENT at the time of trial was incorrect as a matter of law. In their remaining issues, appellants contend the trial court erred in: awarding attorney's fees to Jones based on the alleged denial of access to books and records (issue five); determining shareholder oppression occurred based on particular jury findings (issue six); awarding attorney's fees on Jones's breach of contract claim (issue seven); and awarding attorney's fees to Jones based on an intervention filed by his wife (issue eight).

In his first two cross-issues, Jones challenges the finding that he breached an agreement between the parties and thereby caused damages and the award of attorney's fees based on that alleged breach. In cross-issues three and four, Jones challenges the trial court's reduction of the buy-out award for shareholder oppression and urges that if we reverse the award of ancillary income for appellants' breach of contract, we make the same award based on the shareholder oppression findings.

We modify the judgment so as to render the award of attorney's fees for the denial of access against TENT and not the individual defendants and remand for further consideration of the correct amount to be awarded. We reverse the trial court's buy-out

2

order, but remand Jones's shareholder oppression claims for further consideration below. We additionally reverse the award of damages and attorney's fees based on Jones's alleged breach of contract and render judgment TENT take nothing on that cause of action. We overrule all other issues.

## I. Background

Jones was one of the founding members of TENT in 1996. Three basic documents governed the relationship between each member, TENT, and the other members: (1) a Members Agreement, (2) Regulations, and (3) a Physician's Employment Agreement (one for each member, governing their employment within the practice). An original set of documents was signed by all of the members in 1996. Over time, members joined and departed TENT and changes were needed in the governing documents. A second set of documents was drafted in 2002; however, it was disputed whether all the members signed all of the new documents. The issue was presented to the jury, which found that Jones's relationship with TENT and the other members was governed by the 1996 Employment Agreement (1996 EA), the 2002 Members Agreement (2002 MA), and the 2002 Amended Regulations (as further modified by amendments passed at a 2008 board of directors meeting).

Members received a monthly salary under the agreements and, if the member generated additional net revenue, a monthly salary supplement; however, if a member generated less revenue than salary received in a month, he owed the difference back to TENT. Members also received additional income that was generated by services other than those provided directly by a doctor, such as administration of hearing tests. The 2002 EA referred to this additional income as "ancillary income" and provided for its equal distribution, but there was evidence this income was divided evenly even before 2002. In 2002, the then-current members of TENT established a separate corporation, Texas Center for Hearing Aids, Inc., which also divided profits equally among the

3

members but had no direct relationship to TENT.

Further under the agreements, TENT was required to give six months' written notice to terminate a member's employment, and such termination could only be accomplished by unanimous consent of the other members. A member was required to give one year's notice of retirement. As will be discussed in more detail below, retirement, termination, or abandonment triggered certain redemption procedures. A member who abandoned his interest still would be liable for his share of liabilities until a replacement was found.

From early on, TENT utilized a flexible line of credit. By 2009, apparently due to an expansion in services, TENT's debt had grown substantially to about $1.3 million. TENT also had been outsourcing accounting duties to a third-party provider, which allegedly was underperforming and may have added to the escalating debt. The members began holding frequent meetings, brought the accounting back to an in-house bookkeeper, and decided to have an audit performed. Jones had said that he planned to retire near his 70th birthday, which was on January 8, 2011.

In late October or early November 2009, Jones hired a lawyer and requested performance of the previously-agreed audit and disclosure of certain TENT financial information. On November 15, during an emergency members meeting to discuss accusations of inappropriate behavior by a member of the staff, Jones mentioned a recently-ended affair between Duncan and a TENT nurse. Apparently offended, Duncan resigned as TENT president on November 17, to be replaced by Edmonds. On the morning of November 17, Mrs. Jones encountered Mrs. Albright at a store, and Mrs. Albright said that her husband had informed her on November 15 that Jones was leaving TENT. According to her testimony at trial, Mrs. Jones was surprised by this information. Also on November 17, according to Jones, Edmonds entered Jones's office, accused him of undermining the practice and told him that Duncan could no

4

longer work with him, he was to leave by January 2010, and he should not discuss the matter with the staff.

Jones delivered his notice of retirement on November 19, 2009. He attended two additional members meetings in late November and early December. At the later meeting, the members decided not to pay for an audit despite Jones's insistence. His last day of work for TENT was December 15, and he subsequently went to work at Baylor College of Medicine. TENT then began using ancillary income to pay down its debt and did not pay further ancillary income to Jones, but invoiced Jones for his share of liabilities. Although a new doctor had been employed, allegedly with an eye toward replacing Jones upon his retirement, TENT never replaced Jones as a member. Jones also was removed as a director of the Texas Center for Hearing Aids, allegedly without his knowledge, when it was transferred to another departing member who is not a party to this lawsuit. Jones filed suit on February 22, 2010. At the time of trial, evidence showed that TENT was in the process of being sold to Texas Children's Hospital, with the remaining members to become employees of that entity.

The jury found that TENT failed to comply with the 1996 EA and that its failure was not excused; as a result, the jury awarded Jones $374,694.01 in damages. The jury also found that Jones failed to comply with the 1996 EA, but his failure was excused and TENT breached first. Additionally, the jury found that Jones failed to comply with the 2002 MA, this failure was not excused, and TENT did not fail to comply with that agreement. The jury awarded TENT $286,071.89 in damages. The jury further found that Jones was still a member and director of TENT at the time of trial. Lastly, the jury found that Edmonds, Duncan, and Albright committed seven of eleven listed actions (which the trial court used to determine shareholder oppression) and determined that the fair market value of Jones's ownership interest in TENT at the time of trial was $555,000. As mentioned above, based in part on these findings, the trial court awarded

each side breach of contract damages and related attorney's fees, awarded Jones additional attorney's fees on his claim seeking access to books and records, and ordered the other members to buy out Jones's membership as a remedy for shareholder oppression, albeit at half the value assigned by the jury.[1]

## II. TENT's Appeal

### A. Sufficiency of the Evidence on Breach of 1996 EA

In their first issue, appellants challenge the legal and factual sufficiency of the evidence to support the jury's finding that TENT failed to comply with the 1996 EA. When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id*. at 827. If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

To the extent resolution of issues in this appeal turns on interpretation of contracts between the parties, our primary aim in construing such contracts is to ascertain the true intent of the parties. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.*, 157 S.W.3d 462, 465 (Tex.

---

[1] The trial court stated in the judgment that the reduction in the buy-out price was done "as a matter of equity based upon the jury's findings regarding the conduct of [Jones] and the fair market value of the interest at the time that Jones resigned his employment."

6

App.—Houston [14th Dist.] 2004, no pet.). We examine the writing as a whole in an effort to harmonize and give effect to all the contract's provisions so that none is rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Zurich Am.*, 157 S.W.3d at 465. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense. *Heritage Res.*, 939 S.W.2d at 121; *Zurich Am.*, 157 S.W.3d at 465.

Because of the nature of broad form jury submissions, we do not know exactly what action by appellants the jury found to have violated the 1996 EA. In their briefing, both sides initially focus on Jones's allegations regarding the events of November 2009, including that Edmonds, who was then TENT's president, entered Jones's office on November 17 and told him that he was to leave by January 2010. If the jury concluded that this exchange constituted notice that Jones's employment was terminated as of January 2010, it could have further concluded that this action violated the 1996 EA's termination provisions because Jones was not provided with the requisite six months' written notice of termination contained in section 4.2(f) of the 1996 EA.[2]

Appellants argue that the alleged conduct by Edmonds could not have been a breach of the agreement because section 4.2(f) required a unanimous vote of the board of directors, excepting the individual member whose employment was being terminated. Appellants assert that there was no evidence Edmonds ever obtained the consent of the other members before informing Jones he was to leave by January. While appellants are correct that the record does not contain direct evidence that a unanimous termination vote was taken, it does contain evidence from which the jury could have reasonably concluded that the termination was unanimously approved by the other members. *See City of Keller*, 168 S.W.3d at 822 (requiring that in performing a legal sufficiency

---

[2] Under section 4.2(f), either the employer or the employee could terminate employment "at any time, with or without cause" and "[u]pon six (6) months written notice."

review, we indulge every reasonable inference from the evidence that supports the challenged finding). To begin with, the jury may have found it significant that Edmonds was TENT president at the time of his alleged comments; he therefore would have been a logical person to have spoken on behalf of the other members.

Jones testified that during the November 17 exchange, Edmonds specifically stated that Duncan could no longer work with Jones and therefore Jones had to leave. This evidence allowed a reasonable inference that there had been a discussion regarding terminating Jones's employment among the other members and that a decision had been reached in that regard.[3] Moreover, Mrs. Jones testified that she spoke with Mrs. Albright on November 17, and at that time, Mrs. Albright indicated that she had learned from her husband two days before that Jones would be leaving the practice. Mrs. Albright confirmed in her testimony that such a discussion took place between her and Mrs. Jones and that her husband told her prior to November 17 that Jones would be leaving in January 2010. This testimony also allows a reasonable inference that the members had decided unanimously to terminate Jones's employment as of January 2010 and that Edmonds informed Jones of this decision on November 17.[4]

Appellants next assert that the breach finding conflicts with the jury's answer to another question that the other members did not "[i]mproperly force John Jones to resign his employment." This argument rests on a faulty premise. Assuming the jury

---

[3] Along these lines, meeting notes taken by TENT's practice manager, Nancy Turner, reveal an entry dated November 18, 2009, in which she states "John [Jones] is leaving after Dec." The jury could have interpreted this as evidence she knew Jones had been terminated before he gave her his letter of resignation on November 19.

[4] In their reply brief, appellants suggest that this interpretation of the evidence interjects apparent authority into the case when it was not raised, much less tried, below. We reject this characterization of the evidence. The jury was free to make inferences from the evidence as long as those inferences are reasonable. *See Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 837 (Tex. 2009) (indulging "all reasonable inferences in favor of the jury's verdict"). Appellants offer no legal authority suggesting that Jones was required to present direct evidence that a unanimous vote was taken in order to prove appellants failed to comply with the 1996 EA.

8

concluded that a unanimous vote to terminate Jones's employment occurred, such a conclusion would not contradict the jury's finding that Jones was not forced to resign. Being officially terminated is not the same as being forced to resign. Although the two concepts could be functional equivalents under particular circumstances, they are not necessarily the same thing. In fact, the jury may have concluded that, having already been terminated as an employee, Jones could not have resigned; thus, there could not have been a forced resignation.[5]

Appellants attack Jones's credibility by pointing out that there was no written notice of termination to support his claim and Jones did not mention the conversation with Edmonds in his 2011 deposition, excerpts of which were read into the record, especially when asked what his partners did to force him out. Jones also stated in an email to a staff member prior to leaving the practice that he was leaving due to the "financial impossibility of slowing down in the eat what you kill policy we have in our practice." Additionally, Jones could not remember the time of day the confrontation allegedly occurred. These may well have been factors for the jury to consider in its assessment of Jones's credibility; however, the jury is the sole judge of credibility and of the weight to be given testimony. *See City of Keller*, 168 S.W.3d at 819. The jury may ultimately have been persuaded by Jones's ability to recall specific details of his alleged conversation with Edmonds, as well as Mrs. Jones's recounting of her conversation with Mrs. Albright. The factors cited by appellants do not render the verdict against the great weight and preponderance of the evidence.

Lastly, appellants contend that Edmonds' acts were at most a repudiation of the agreement as they demonstrated no more than an intention not to perform under the

---

[5] Although in his deposition testimony read to the jury at trial, Jones spoke about his resignation from employment, the jury was not required to accept this characterization of Jones's departure in light of his live testimony and other evidence at trial. *See, e.g., Hudson v. Forest*, No. 14-14-00073-CV, 2015 WL 1869469, at *2 (Tex. App.—Houston [14th Dist.] Apr. 23, 2015, no pet. h.).

9

contract in the future. *See generally El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st. Dist.] 2003, pet. denied) ("To constitute a repudiation, a party to a contract must have absolutely and unconditionally refused to perform the contract without just excuse."). In making this argument, appellants rely on the fact Edmonds did not have authority to unilaterally terminate Jones, told Jones only that he had to leave by January and not that he was terminated, and did not tell Jones that all of the other members agreed.

We disagree. The jury reasonably could have concluded that Edmonds was informing Jones that his employment was being terminated and he had to leave the practice by January. Appellants cite no supporting authority that because Jones was not ordered to leave immediately, there was no immediate breach of the agreement. The jury reasonably could have found that a breach occurred when Jones was told to leave in less than six months because the 1996 EA required six months' notice of termination. As discussed above, this conclusion was supported by both Jones's and Mrs. Jones's testimony. Finding no merit in any of appellants' arguments, we overrule their first issue.

### B. Award of "Ancillary Income" due to Alleged Breach

In their second issue, appellants challenge the legal and factual sufficiency of the evidence to support the damages awarded to Jones under the breach of contract cause of action. Question 9 in the charge read as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate John Jones for his damages, if any, that were caused by TENT's failure to comply that you found in response to Question 4 . . . ?
>
> Consider the following elements of damages, if any, and no others. Do not add any amount for interest on past damages, if any.
>
> Answer separately in dollars and cents for damages, if any.

10

ANSWER:

| | |
|---|---|
| (a) retirement payments | $ 0 |
| (b) stock redemption | $ 0 |
| (c) ancillary income | $ 374,694.01 |
| (d) lost wages | $ 0 |

Appellants specifically argue that ancillary income was not recoverable under the 1996 EA and Jones's damages expert's testimony was conclusory.

The goal of measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach. *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The normal measure in such cases is the benefit of the bargain, which seeks to place the injured party in the economic position it would have been in had the contract been performed. *Id.* In order to recover for a breach of contract, a plaintiff must establish that he sustained damages as a result of the breach. *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

### 1. Recoverability of "Ancillary Income"

As stated, appellants first argue that ancillary income could not be awarded for a breach of the 1996 EA because that agreement does not reference that type of income. This contention misses the mark. The jury was not instructed to reference only a measure of damages contained within the 1996 EA itself but was asked to award Jones what it concluded he would have been entitled to receive had he not been terminated improperly and instead been allowed to retire.

The jury charge does not define what was meant by the use of the term "ancillary income" in Question 9. The 2002 EA defined ancillary income as "that income attributable to services other than surgery or direct patient contact by physicians, services defined as 'incident to' and Designated Health Services." Put more simply, and

11

as established by testimony at trial, ancillary income was revenue not specifically tied to treatment by a specific member. Under the 2002 EA, ancillary income generally was distributed equally to all TENT members.

While the 1996 EA—which the jury found was the controlling document for Jones's employment and appellants breached—did not expressly use the term "ancillary income," it did provide for the distribution of revenue that was not specifically tied to treatment by a specific member. In paragraph 3.3, the 1996 EA provided not only for distribution of collections from patients for treatment by physicians, but also for distribution "of all other income of [TENT] from all sources." Thus, although the terminology and the details of distribution were not identical in the two documents, it is clear that what is designated as "ancillary income" in the 2002 EA also is distributed to members under the 1996 EA. In other words, the 2002 EA did not create income that was not available under the 1996 EA; the 2002 EA merely used different terminology and a different distribution scheme.

More importantly, in response to Question 3, the jury found that the members of TENT agreed in 2008 that the following term would be binding among them:

> Retiring members would not be paid any designated severance amount, but rather will be paid net collections for one (1) year; and that one share of the ancillary revenue generated by net OAE [newborn hearing screening] revenue, hearing aid sales, and audiology testing will be paid to the retiring member for a term of five (5) years. . . .

Jones's damages expert, Bryne Liner, calculated that five years' worth of ancillary income starting around the time Jones left TENT would have been about $374,694.01, which is the exact dollar figure the jury found Jones was entitled to receive as damages for appellants' breach of the 1996 EA. The jury therefore appears to have concluded that, had appellants not terminated Jones, he would have retired from TENT and been entitled to receive ancillary revenue or income for five years. *See generally Mays*, 203

12

S.W.3d at 577 (explaining that breach-of-contract damages should compensate for any loss sustained as a result of the breach). The fact that the jury charge used the term "ancillary income," the 1996 EA does not, and the jury found the added 2008 term represented "ancillary revenue" is of no moment. The same concept—i.e., revenue that was not specifically tied to treatment by a specific member—was consistent throughout.[6] Appellant's first argument regarding the damages award is therefore without merit.

## 2. Expert Testimony

We next turn to appellants' contention that Liner's testimony was conclusory and thus insufficient to support the damages awarded. Conclusory opinions, even of a qualified expert, are not competent, relevant evidence capable of supporting a judgment even in the absence of an objection to such testimony. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). An expert's simple *ipse dixit* is insufficient; the expert must explain the basis of his statements in order to link his conclusions to the facts. *Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124, 148 (Tex. App.—Fort Worth 2011, pet. denied) (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)).

As explained above, Liner testified that Jones's share of ancillary income over a five-year period would have been the exact dollar figure the jury found as breach of contract damages. Appellants make two primary arguments regarding why Liner's testimony should be deemed conclusory. First, appellants contend that Liner failed to explain why Jones was entitled to a share of ancillary income when the 1996 EA—the

---

[6] Appellants argue that the damages award was improper only because the 1996 EA did not reference ancillary income, an argument that is both factually inaccurate (it did, but used different terminology) and misses the basis of the damages awarded. Appellants do not argue that the jury should not have considered what Jones lost in potential retirement income when he was terminated. We therefore do not address the issue further.

13

agreement governing Jones's employment relationship with TENT—did not reference such income. This assertion is largely a replication of the arguments discussed and rejected above concerning recoverability of ancillary income. Additionally, the importance and focus of Liner's testimony was the calculation of the amount of damages, not whether Jones was entitled to damages under the facts presented, which was a determination for the jury to make. Accordingly, the first argument regarding Liner's testimony is without merit.

In their second argument, appellants contend that, in making his calculations, Liner failed to consider certain changes in TENT's revenue for newborn hearing screenings, which Liner acknowledged was a significant component of ancillary income. Specifically, they complain that Liner failed to take into account that TENT lost five of its eight contracts for providing such services to hospitals between 2010 and the time of trial in 2013 and a third-party payor of those fees was refusing to pay for services previously rendered.[7] Liner defended his failure to consider these two factors by explaining that he used historical revenue and distribution data to calculate the amount of ancillary income for the five-year period after Jones left TENT; thus, his calculations were not dependent on specific fluctuations that may have occurred, but were an attempt to establish solid projections over time.[8]

We begin our analysis by noting that appellants' second argument is not actually an assertion that Liner's testimony was conclusory, but instead posits that his calculations were erroneous because he did not contemplate the changes to the newborn hearing screening revenue stream.[9] Liner's testimony was not conclusory. Liner

---

[7] In support of these propositions, appellants cite to Dr. Edmonds' testimony but not to any documentary evidence supporting that testimony.

[8] Indeed, Liner could not have simply calculated the actual ancillary income for the relevant time period because that time period extended beyond the date of his testimony.

[9] Appellants are careful to couch their argument as asserting Liner's testimony was

14

explained the basis for his calculations in some detail, describing how he went about preparing his expert report by reviewing considerable historical data about TENT's ancillary income, TENT's distribution reports and accounting data, membership and employment agreements, tax returns, member K-1 forms, and loan documents. He also attended the deposition of TENT's financial expert and talked to Jones about how the firm operated. He explained reports that he generated and how he analyzed trends over time. He described the Gordon Growth Model, which he used to project future cash flows, and he compared his results to those reached by an accounting firm hired by Texas Children's Hospital to help analyze its potential purchase of TENT. The mere fact that Liner did not include the loss of certain revenue in his calculations did not render his testimony conclusory. *See, e.g., Cardiac Perfusion Servs., Inc. v. Hughes*, 380 S.W.3d 198, 206 (Tex. App.—Dallas 2012) (rejecting contention expert's testimony was conclusory because expert failed to consider certain factors in assessing fair value of stock when expert gave detailed explanations supporting his opinion), *aff'd in part, rev'd in part on other grounds*, 436 S.W.3d 790 (Tex. 2014). Finding no merit in their contentions, we overrule appellants' second issue.

## C. Excuse of Jones's Own Breach

In issue three, appellants challenge the jury's finding that Jones's own breach of the 1996 EA was excused. In Question 10, the jury found that, like TENT, Jones also failed to comply with the 1996 EA, and in Question 11, the jury found that his failure to comply was excused. Question 11 instructed the jury that Jones's breach was excused if (1) the parties agreed to a new term or (2) TENT made a false representation or concealed material facts intending Jones would rely on the representation or

---

conclusory—which does not require preservation in the trial court—instead of assailing the reliability of his testimony—which would require preservation below. *See Cardiac Perfusion Servs., Inc. v. Hughes*, 380 S.W.3d 198, 206 (Tex. App.—Dallas 2012), *aff'd in part, rev'd in part on other grounds*, 436 S.W.3d 790 (Tex. 2014). Appellants did not challenge Liner's testimony on the basis of reliability in the court below.

15

concealment, Jones did not know and had no means to discover the real facts, and Jones relied to his detriment. Both sides appear to agree that Jones's breach of the 1996 EA was his failure to give six months' notice of his retirement. Appellants assert that there was no evidence of any "new term," and, assuming the misrepresentation or concealment allegedly relied upon was Edmonds purported firing of Jones, Jones readily could have determined the real facts by querying other members.

Jones argues that the question of "excuse" was rendered immaterial by the jury's separate finding, in answering Question 16, that TENT breached the 1996 EA first. We agree. "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). A jury question is considered immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, or it has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999). If TENT breached first, Jones's performance was excused irrespective of whether the parties agreed to a new term or Jones relied on a misrepresentation or concealment. *See Lake Conroe Med. Ctr., Ltd. v. KMT Bldg. Co.*, 290 S.W.3d 541, 549-50 (Tex. App.—Beaumont 2009, no pet.).

In their reply brief, appellants respond to Jones's argument only by asserting that they could not have breached first because they committed no breach at all. As discussed above in regards to appellants' first issue, the evidence was legally and factually sufficient to support the jury's finding that appellants did in fact breach the 1996 EA. The evidence further supports the conclusion that appellants' breach occurred on November 17, 2009, when Edmonds told Jones he was to leave by January 2010, and that Jones's breach occurred at the earliest on November 19, 2009, when he submitted

16

his written notice of retirement.[10]   Because Jones's breach was excused by appellants' prior breach, the jury's answer to Question 11 was immaterial.   Accordingly, we overrule appellants' third issue challenging this finding.

### D.  Jones's Membership in TENT

In issue four, appellants challenge the jury finding, in response to Question 17, that Jones was still a member of TENT at the time of trial.[11]   They assert that Jones's membership status was proven as a matter of law, and therefore, the trial court should have disregarded the jury's finding.  *See* Tex. R. Civ. P. 301 (governing the trial court's disregarding of jury findings); *City of Keller*, 168 S.W.3d at 810-11, 823 (discussing standards of review related to disregarding jury findings). Appellants specifically contend that under the terms of the 2002 Regulations and the 2002 MA, Jones's membership was terminated when he announced his retirement, and his interest was then "involuntarily transferred" back to TENT; thus, according to appellants, Jones had no existing membership at the time of trial that the court could order to be bought out.

Appellants argue section 6.1(a) of the 2002 Amended Regulations provides that "retirement of a member immediately terminates the member's membership in TENT." However, this is not exactly what the section says.  Section 6.1(a) states in full:

> The death, retirement, resignation, or dissolution of a Member, or the period for the duration of the Company [i.e., TENT] as stated in the Articles [i.e., TENT's Articles of Organization] expires, or the occurrence of any other event which terminates the continued membership of a Member in the Company (a "Dissolution Event"), dissolves the Company unless the remaining Member(s) unanimously consent in writing to the

---

[10] The jury found in response to Question 18 that Jones gave written notice of his intent to retire on November 19, 2009.   The notice identified December 15, 2009 as the prospective date of retirement.

[11] Question 17 was potentially relevant to several causes of action and available remedies. Question 17 was not conditioned on any response to any other question.

continuation of the business of the Company ("Unanimous Consent").[12]
The section does not say what becomes of a member's ownership interest upon retirement; that subject instead is governed by article III of the 2002 MA.

Section III(A) of the 2002 MA sets forth numerous occurrences that could result in the involuntary transfer of a member's ownership interest in TENT as well as procedures for handling such transfers. The dozen or so occurrences listed in section III(A) include death of the member, termination of the member's employment with the medical group with or without cause, termination of employment by the member with or without cause, and "Total and Permanent Retirement of the Member from the Practice of Medicine and from the medical Group."[13] Article IV of the agreement provides various methods for valuation of a member's ownership interest depending on the nature of the termination of membership.[14]

Appellants assert that Jones's attempt to retire on November 19, 2009 was ineffective under III(A) because he did not at that time retire from the practice of medicine. They argue that Jones instead simply terminated his employment with TENT without cause, which according to article IV of the 2002 MA would entitle him to $10 as payment for his interest in TENT. In making this argument, appellants gloss over the

---

[12] Appellants do not mention dissolution of TENT as was to occur under section 6.1(a) upon the death, retirement, resignation, or dissolution of a member. They also do not mention unanimous written consent to the continuation of the business as would be required for the remaining members to continue doing business after such a dissolution event.

[13] Article II of the 2002 MA points out that while a member's retirement might be a voluntary act, the ensuing transfer of ownership interest is to be treated as an involuntary transfer pursuant to section III.A.

[14] For example, for certain membership termination events, the purchase price for the member's ownership interest is set at $10. For other events, such as termination by the medical group without cause, the price "shall be the greater of the Established Value or the Initial Capital Contribution paid by the Member." Article IV further set the "Established Value" at $250,000 subject to subsequent change by a unanimous vote of the board of directors. The jury found in response to Question 3 that the Established Value had subsequently been set at zero.

18

jury's finding that appellants improperly terminated Jones's employment before his attempted retirement. However, the ending of Jones's employment with TENT, whether a retirement, resignation, or termination, does not determine whether he retained his membership interest in TENT.

Contrary to appellants' assertion that the transfer of interest is automatic on the occurrence of one of these events, section III(A) of the 2002 MA requires specific steps before a transfer can be effected. Upon occurrence of any of the listed events, the medical group itself has a "right of first refusal" to purchase the departing member's ownership interest. To do so, the group is required to give notice of that intent within 30 days following the event. If the group fails to do so, the remaining individual members possess a "Second Right of Refusal," which begins on the 31st day after the triggering event and runs indefinitely. If neither option is exercised, the departing member (or his legal representative) may continue to hold the ownership interest so long as such ownership does not violate specified laws and regulations governing medical practices. In that situation, the member also has the right to demand redemption of his shares by the medical group.

Thus, unless one of the listed procedures for transfer occurred, Jones still owned his shares at the time of trial as found by the jury. *See Harris Cnty. Util. Dist. No. 16 v. Harris Cnty. Mun. Dist. No. 36*, No. 01-10-00042-CV, 2011 WL 3359698, at *6 (Tex. App.—Houston [1st Dist.] Aug. 4, 2011, no pet.) (mem. op.) ("When a party's obligation under the contract is conditioned upon the happening of a future event, the condition must be performed or fulfilled exactly as set forth in the contract before the promise can be enforced."). Appellants alternatively contend that the medical group in fact exercised its right of first refusal. Specifically, appellants point to the testimony of TENT's bookkeeper, Sara Patterson, who stated that in the first quarter of 2010, Jones

19

was given a \$10 credit in TENT's books for his stock.[15]

In support of the jury's finding, Jones cites numerous times after January 2010 when TENT continued to represent that he was a member, both in internal and external communications. Jones continued to be listed on TENT's tax returns and his own K-1s from TENT. In March 2010, Edmonds stated in an email that Jones should be invited to board meetings, as he was still a member. In a July 2010 letter from TENT to its bank, Jones was listed as a "remaining partner." Appellants attempt to shift attention from these representations by emphasizing Patterson's additional testimony that TENT only continued to represent Jones as a partner on his K-1 forms because he still owed his proportionate share of TENT's debt. Appellants insist that other former members were no longer listed because they had paid their shares of the debt. However, the jury reasonably could have rejected Patterson's testimony and concluded that appellants would not have continued including Jones in board meetings if he were not still a member. *See City of Keller*, 168 S.W.3d at 822, 827. Accordingly, the trial court did not err in refusing to disregard the jury's finding that Jones was still a TENT member at the time of trial. We therefore overrule appellants' fourth issue.

---

[15] Appellants do not cite any documentary evidence supporting Patterson's brief mention of a credit or point to any evidence that the medical group provided notice within 30 days of its intention to purchase Jones's interest, as required under the 2002 MA. Additionally, Article V of the 2002 MA requires the purchase price be paid by "cash or certified check at the Closing." Patterson did not reference cash or check as payment for Jones's interest or that any closing occurred for the transaction.

Citing Texas Rule of Civil Procedure 54, appellants assert in a reply brief that they were excused from proving they gave notice because (1) notice is a condition precedent, (2) they pleaded that all conditions precedent had been performed, and (3) Jones did not specifically deny that notice was given. Tex. R. Civ. P. 54. This argument was not raised during trial or in post-verdict briefing to the trial court and was first raised in a reply brief on appeal. The argument is therefore waived. *See* Tex. R. App. P. 33.1(a) (providing that to preserve a complaint for appellate review a timely request, objection or motion must be made in the trial court stating the grounds for the ruling sought); *Priddy v. Rawson*, 282 S.W.3d 588, 597 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (arguments raised for first time in reply brief are waived).

### E. Attorney's Fees Based on Alleged Denial of Access

In their fifth issue, appellants challenge the award of attorney's fees for the alleged denial of access to TENT's books and records, the only relief sought or awarded for this cause of action at trial. In its judgment, the trial court explained that the award was based on the jury's answer to subpart (b) of Question 20 as well as sections 3.151 *et seq.* and 101.501 *et seq.* of the Texas Business Organizations Code. The court awarded Jones $112,240.89 for past attorney's fees as well as additional sums in the event of an appeal. The award specifically was imposed on the individual physicians and not on TENT as an entity. Jones made his first written request for access on November 18, 2009, but made subsequent requests as well.

Appellants raise eight sub-issues regarding the award of attorney's fees, including that (1) Jones failed to state a proper purpose for requesting access; (2) applicable law did not provide for such recovery; (3) Jones was not a "governing person" entitled to recovery; (4) the court erred in its jury submission on the issue; (5) the evidence is legally and factually insufficient to support the finding that Jones was denied access; (6) if denial occurred, it was only after his membership was terminated; (7) the court erred in ordering the individual defendants, rather than TENT, to pay the fees; and (8) Jones failed to properly segregate his attorney's fees. We find that the court should have entered the award against TENT and not the individual defendants and that Jones failed to segregate his attorney's fees properly. We therefore modify the judgment to make the award against TENT and not the individuals and remand for further consideration of the proper amount to be awarded. We otherwise affirm the award.

#### (1) Applicable Law

Appellants first two arguments—that Jones failed to state a proper purpose for requesting access and that applicable law did not provide for the recovery of attorney's fees—are both premised on the notion that the question of access and the available

21

remedy were governed by the Texas Limited Liability Company Act and not the Business Organizations Code as determined by the trial court. Under the Act, "[a] member . . . on written request stating the purpose, may examine and copy . . . for any proper purpose . . . records required to be kept under this section and other information . . . ." Tex. Rev. Civ. Stat. art. 1528n § 2.22.D (expired).[16] With enactment of the Business Organizations Code, the requirements for a member to access records changed to: "A member . . . on written request and for a proper purpose, may examine and copy" the required records. Tex. Bus. Orgs. Code § 101.502(a). The Code additionally provides that a "governing person" of a covered "entity may examine the entity's books and records . . . for a purpose reasonably related to the governing person's service as a governing person." *Id*. § 3.152(a). The Code further authorizes an award of attorney's fees as an available remedy for denial of access, at least as to a request by a governing person. *Id*. § 3.152(c).

Appellants assert that the Act rather than the Code applies to the present case because Jones made his first request for access on November 18, 2009, prior to the Act's expiration and the Code's mandatory application date of January 1, 2010. On that basis, appellants further argue that the trial court's judgment is in error because Jones's written request did not state a purpose—as required by the Act but not the Code—and attorney's fees were not an available remedy under the Act.

By its own terms, the Code governs "acts, contracts, or other transactions by an entity subject to this code or its managerial officials, owners, or members that occur on or after the mandatory application date." *Id*. § 402.006. Prior applicable law (in this case, the Act) continues to govern such acts, contracts, and transactions that occurred before the mandatory application date. *Id*. Although Jones made his first written

---

[16] The Act expired by its own terms on January 1, 2010. Tex. Rev. Civ. Stat. art. 1528n § 8.13. Additionally, the Business Organizations Code's mandatory application date for entities such as TENT was the same date. *See* Tex. Bus. Orgs. Code §§ 401.001(1)(C), 402.006.

request for access on November 18, 2009, Jones testified that he made later, continued requests for such information and never received access to all of the information sought. He specifically mentioned that he never received certain tax returns despite later requests by Jones's attorney. Moreover, Jones filed the present lawsuit seeking access to TENT's books and records on February 22, 2010, after the January 1, 2010 effective date of the Code. Additionally, Jones introduced into evidence a letter from Jones's attorney to TENT's attorney stating that Jones had yet to receive a copy of an electronic database of TENT financial information that he had requested. In the letter, dated May 26, 2010, Jones's attorney encouraged TENT to produce the database without further delay. During the course of the litigation, Jones's requests for access were the subject of several requests for production and motions to compel. So, while it is clear that Jones's first written request for access was made while the Act was still in force, it is equally clear that Jones made further requests and appellants refused to comply after the Code became applicable. *See* Tex. Bus. Orgs. Code §§ 401.001(1)(C), 402.006. Accordingly, the trial court did not err in holding that the Code governed. Consequently, we find appellants' contentions to be without merit.

**(2) "Governing Person"**

Appellants additionally contend Jones was not a "governing person" entitled to recover attorney's fees under the Code. *See* Tex. Bus. Orgs. Code § 3.152(c) ("A court may award a governing person attorney's fees and any other proper relief in a suit to require a filing entity to open its books and records . . . ."). The sole basis for appellant's argument that Jones was not a governing person under the Code is a citation to Jones's Third Amended Petition, wherein he stated that: "Although DR. JONES has retired from TENT's medical practice, DR. JONES remains a Member of the limited liability company and therefore, has the right to examine TENT's books and records pursuant to Sections 3.151 *et seq.* and 101.501 *et seq.* of the Texas Business

23

Organizations Code."

Based on this assertion, appellants contend Jones admitted he was not a governing person at the time of his request and the judgment was not supported by Jones's pleading. Regarding the first contention, there is nothing in the quoted passage that admits Jones was not a governing person of TENT. The passage states Jones had retired from TENT's medical practice but remained a member. It does not mention anything about his governing status.[17]

Appellants provide no record cite as to where they raised the issue of pleading deficiency before the trial court. A party who fails to raise the lack of a pleading in the trial court before submission of the case cannot seek reversal on appeal based on the alleged pleading deficiency. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991); *Estate Land Co. v. Wiese*, No. 14-13-00524-CV, 2015 WL 1061553, at *6 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet. h.) (mem. op.). The question of whether and when Jones was entitled to access TENT's books and records was hotly contested at trial. *See* Tex. R. Civ. P. 67 (governing trial by consent); *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding that to determine whether an issue was tried by consent, it must appear the issue was actually tried). Jury Question 19 asked when Jones ceased to be a TENT director, if he did, and Question 20(b) asked whether appellants improperly failed to allow Jones to inspect the books and records. Appellants objected to Question 19 on the ground that the date was proven as a matter of law and to Question 20(b) on the ground that it should have contained an instruction regarding "proper purpose."

---

[17] Question 19 (which asked on what day Jones ceased being a TENT director), instructed the jury, "Do not answer this question if you find that John Jones is still a [TENT] director" as of the time of trial. The jury did not answer the question, and appellants do not specifically challenge this finding. The Code defines a "governing person" as "a person serving as part of the governing authority of an entity" such as a "board of directors" or a "member" of an LLC "managed by [the] members." Tex. Bus. Orgs. Code § 1.002 (35)(A)(i, iv), (37).

24

Appellants did not raise the pleading issue until their motion for new trial, which was too late.[18]  *See Roark*, 813 S.W.2d at 495; *Estate Land Co.*, 2015 WL 1061553, at \*6.

**(3) Jury Submission**

Next, appellants assert that the trial court erred in its jury submission on denial of access.  In Question 20(b), the court asked the jury whether appellants "[i]mproperly fail[ed] to allow John Jones to fully inspect TENT's financial books or records[?]"[19] Appellants specifically complain regarding the court's refusal to submit their tendered instruction to accompany the question, which read as follows:  "You are instructed that John Jones was entitled to access to TENT's books and records for a 'proper purpose.' You are instructed that demands for records to harass TENT, force TENT to purchase Jones' interest at an inflated price, or made in bad faith, are not 'proper purposes.'"

A trial court has considerable discretion in determining necessary and proper jury instructions.  *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *see also Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.—San Antonio 1998, pet. denied) (noting trial court has more discretion over instructions than questions).  A proper instruction must assist the jury, accurately state the law, and find support in the pleadings and evidence.  *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000).  A failure to submit a definition or instruction is not a ground for reversal on appeal unless a substantially correct definition or instruction has been requested in writing and tendered by the complaining party.  Tex. R. Civ. P. 278. Explanatory instructions should be submitted when, in the discretion of the trial court, it

---

[18] Indeed, as late as their Motion for Entry of Judgment and Motion to Disregard Jury Findings, appellants were arguing only that Jones was not entitled to access because the evidence demonstrated he was no longer a member or director, not that he failed to plead denial of access.

[19] Question 20 was aimed at ascertaining whether appellants committed shareholder oppression against Jones, but the trial court also used the answer to subsection (b) in determining the issue of denial of access.  Neither side raises any complaints on appeal regarding the manner in which the jury charge was structured.

will help jurors understand the meaning and effect of the law and the presumptions the law creates. *Pitts v. Sabine River Auth. of Tex.*, 107 S.W.3d 811, 819 (Tex. App.—Texarkana 2003, pet. denied). When a trial court refuses to submit a requested instruction, the ultimate question on appeal is whether the instruction was reasonably necessary to enable the jury to render a proper verdict. *Mandlbauer*, 34 S.W.3d at 912 (citing Tex. R. Civ. P. 277).

As appellants state, the language in their proposed instruction was derived from the Dallas Court of Appeals opinion in *In re Dyer Custom Installation, Inc.*, 133 S.W.3d 878, 881-82 (Tex. App.—Dallas 2004, orig. proceeding). In that case, the court listed allegations that had been found sufficient to entitle a corporation to a jury trial on the issue of whether a shareholder had a proper purpose in requesting access under article 2.44 of the Texas Business Corporations Act which, when in force, provided similar access to that provided by the Code provisions at issue here. *See id*. But even assuming the *In re Dyer* analysis is applicable in the context of the present case, not every correct statement of the law belongs in the charge; a requested instruction can be both a correct statement of the law and still be unnecessary in the charge. *See Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984); *see also Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 267 S.W.3d 454, 482 (Tex. App.—Houston [14th Dist.] 2008) (holding trial court acted within its discretion when it refused to include unnecessary additional statement in charge), *rev'd on other grounds*, 352 S.W.3d 445 (Tex. 2011).

Appellants do not cite any authority that such an instruction was reasonably necessary to enable the jury to render a proper verdict. *See Mandlbauer*, 34 S.W.3d at 912. A trial court should not burden the jury with surplus instructions. *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex. 2010) (citing *Acord*, 669 S.W.2d at 116). The trial court here reasonably could have determined that the requested instruction was unnecessary for the jury's understanding of the issue and that it only

26

served to emphasize appellants' position. *See, e.g., Ace Fire Underwriters Ins. Co. v. Simpkins*, 380 S.W.3d 291, 305 (Tex. App.—Fort Worth 2012, no pet.) (holding trial court was within its discretion in rejecting additional definitions and instructions due to concern that they highlighted particular witness's testimony). Accordingly, we find no merit to appellants' charge complaint.

### (4) Legal and Factual Sufficiency

Appellants further argue that the evidence is legally and factually insufficient to support the finding that Jones was denied access to TENT's records. In considering this argument, we again utilize the normal standards for legal and factual sufficiency review as set forth above. *See City of Keller*, 168 S.W.3d at 822 (legal sufficiency); *Cain*, 709 S.W.2d at 176 (factual sufficiency). Appellants specifically point out that Jones acknowledged in his testimony that TENT's bookkeeper did not refuse him access to the books and records in her possession; instead, she did not have all of the information regarding TENT's finances that he requested. Appellants then assert that TENT was not required to keep all of the records Jones requested. In their three-sentence argument on legal and factual sufficiency, however, appellants offer no analysis regarding the types of information Jones requested that TENT was not required to maintain or why, if there was information TENT should have been able to provide but did not, this was not a denial of access for which Jones could recover his attorney's fees. It is therefore not properly briefed. *See* Tex. R. App. P. 38.1(i) (requiring that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *In re S.A.H.*, 420 S.W.3d 911, 929 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (declining to develop party's argument beyond the stated proposition in her brief). Consequently, we find no merit in appellants' sufficiency assertions.

### (5) Membership Had Not Terminated

Appellants next assert that even if Jones was denied access, such denial occurred only after his membership had terminated and he was not entitled to access. As discussed above, the jury reasonably found that Jones was still a member of TENT at the time of trial; thus, he was a member when he requested access to TENT's books and records. We therefore find no merit in this contention regarding the award of attorney's fees.

### (6) Individual Physicians Liable

Appellants next argue, based on section 3.152 of the Code, that the trial court erred in ordering the individual defendants to pay Jones's attorney's fees instead of TENT. Tex. Bus. Orgs. Code § 3.152(a) (authorizing attorney's fees award in suit seeking access). The primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *Tex. Dep't. of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004). We begin with the plain and common meaning of the statute's terms, reading the statute as a whole and not as isolated parts. *Id*. When the language used is unambiguous, we interpret a statute according to its own terms. *Id*.; *see also* Tex. Gov't Code § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We also take into account the objective the law seeks to obtain and the consequences of a particular construction. *City of Sunset Valley*, 146 S.W.3d at 642.

Section 3.152 provides that a court may order an entity covered by the provision to open its books and records if the entity has improperly refused access, and the court may award attorney's fees and other proper relief "in a suit to require a filing entity to open its books and records." Tex. Bus. Orgs. Code § 3.152(b), (c). In order to be entitled to such relief, the person requesting must establish, among other things, that "the entity refused the person's good faith demand to inspect the books and records."

28

*Id*. § 3.152(b).  The focus of the section is therefore clearly on the actions of the entity. The section does not suggest that any individual connected with an entity can be ordered to open the books and records or to pay attorney's fees.

Jones responds to appellants' argument by noting that the jury specifically found that the individual defendants acted in concert to deny Jones's access and arguing that awarding fees against TENT would punish TENT for the actions of its members.  Jones additionally suggests that the award of fees could jeopardize the possible sale of TENT. The fees were awarded pursuant to section 3.152(c) based on the alleged denial of access, not on shareholder oppression by the individual defendants, even though it appears that the jury found the individual defendants caused TENT to deny Jones access.  As discussed, section 3.152 contemplates a suit and associated orders against an entity, not against individuals.  The fact that the individual defendants may have caused the denial of access and TENT may be affected by the award does not change the statutory language.  *Cf. Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 914-15 (Tex. 2004) (rejecting external factors in applying plain language of statute).

We therefore agree with appellants that the trial court should have ordered TENT and not the individual defendants to pay Jones's attorney's fees.  Accordingly, we will modify the judgment to order TENT to pay the fees instead of the individual defendants.

### (7) Segregation of Fees Related to Access

Lastly, as to the denial of access claim, appellants contend that the trial court abused its discretion in awarding attorney's fees to Jones because he failed to properly segregate the portion of his attorney's fees that were related to this claim from the fees related to other claims.  We agree and remand for further consideration by the trial court.

We begin by noting that the Code makes an award of attorney's fees in a suit to

29

obtain access discretionary with the trial court. *See* Tex. Bus. Orgs. Code § 3.152(c). When we review a trial court's exercise of discretion in awarding attorney's fees, the legal and factual sufficiency of the evidence are not independent grounds for review but are relevant factors to be considered. *See Inwood Nat'l Bank v. Wells Fargo Bank N.A.*, No. 05-13-01689-CV, 2015 WL 1929251, at *8 (Tex. App.—Dallas Apr. 29, 2015, no pet. h.). Absent a contract or statute, trial courts do not have inherent authority to require one party to pay another party's attorney's fees; thus, claimants generally are required to segregate fees between claims for which they are recoverable and claims for which they are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). When discrete legal services advance both a claim on which attorney's fees are recoverable and a claim on which fees are not recoverable, the resulting fees are considered "intertwined" and need not be segregated in order to be recovered. *Id*. at 313–14; *Messier v. Messier*, No. 14-13-00572-CV, 2015 WL 452171, at *9 (Tex. App.—Houston [14th Dist.] Jan. 27, 2015, no pet.). But, even in that scenario, if any attorney's fees relate solely to a claim for which fees are unrecoverable, a claimant must segregate the recoverable from the unrecoverable fees. *Chapa*, 212 S.W.3d at 313; *Messier*, 2015 WL 452171, at *9. The party seeking to recover attorney's fees has the burden of demonstrating that fee segregation is not required. *Messier*, 2015 WL 452171, at *9.

In his affidavit in support of fees, Jones's counsel stated that Jones had "incurred and paid a total of $561,204.45 in legal fees plus costs of court." He further stated that approximately 20 percent of the fees were attributable to services rendered in connection with the shareholder oppression claims, which included the denial of access claim. Twenty percent of the stated total fees is $112,240.89, the amount the trial court awarded as attorney's fees for the denial of access. Jones's counsel, however, did not segregate the fees related to denial of access, which could be recovered under section

3.152(c), from those expended on other types of shareholder oppression claims, for which recovery of attorney's fees generally is not permitted. *See Ritchie v. Rupe*, 443 S.W.3d 856, 872-73, 877 (Tex. 2014) (holding that the only available remedy for oppressive actions under the shareholder oppression statute is appointment of a rehabilitative receiver).

Moreover, Jones's counsel did not suggest that such claims were inextricably intertwined such that the fees could not be segregated.[20] Indeed, it stands to reason that while some of the legal services may have gone to support both the denial of access and the other oppression claims, there was likely at least some portion of the fees that pertained only to the requests for access or to the other oppression claims, but not to both sets of claims. The invoices provided by Jones's counsel, although reasonably detailed, offer little aid in segregating fees because they are heavily redacted and primarily record services performed, *i.e.*, drafting correspondence, telephone conferences, etc., and not individual causes of action for which the services were performed.

Because counsel made no attempt to either segregate the fees related to access from those related to other oppression claims or demonstrate that the two sets of claims were intertwined such that fees could not be segregated, the evidence was insufficient to support the trial court's decision to award the entire amount of attorney's fees identified as necessary to prosecute all of the shareholder oppression claims as fees related to the denial of access claim. *See Westergren v. Nat'l Prop. Holdings, L.P.*, 409 S.W.3d 110, 138 (Tex. App.—Houston [14th Dist.] 2013) (reversing award of attorney's fees where party failed to present evidence of segregation or intertwining), *aff'd in part, rev'd in*

_____

[20] The trial court awarded Jones $448,936.56 in attorney's fees against TENT based on his breach of contract claim. Jones's counsel stated that Jones's breach of contract cause of action was inextricably intertwined with his accounting cause of action and the defense against appellants' counterclaims; thus, it was impossible to segregate recoverable fees from nonrecoverable fees for these actions. Counsel did not make this claim regarding the denial of access or oppression causes of action.

*part on other grounds*, 453 S.W.3d 419 (Tex. 2015). Consequently, we find the trial court abused its discretion in making the award. Because Jones's evidence of fees expended is some evidence of what the segregated amount should be for the denial of access claims, we will remand the issue to the trial court for further consideration of the correct amount. *See id.* (remanding for new assessment of amount of fees); *CA Partners v. Spears*, 274 S.W.3d 51, 84 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (same).[21]

### (8) Conclusion

We sustain appellants' fifth issue to the extent it challenges the award of attorney's fees for denial of access against the individual defendants instead of TENT and to the extent it challenges the amount of fees awarded. We therefore reverse the portion of the judgment awarding attorney's fees for denial of access against the individual defendant's and remand for further consideration of the correct amount to be awarded and for entry of an award against TENT.

### F. Shareholder Oppression

In issue six, appellants challenge the jury's findings favoring Jones on his shareholder oppression claims as well as the trial court's buy-out order requiring appellants to pay Jones $277,500 for his interest in TENT. After trial below and the original round of briefing on appeal of this case, a sea change occurred in the realm of shareholder oppression law. In *Ritchie*, the Texas Supreme Court held that there is no common law cause of action for shareholder oppression and the only available remedy under the shareholder oppression statute is the appointment of a rehabilitative receiver.

---

[21] Appellants additionally argue that the amount awarded was grossly excessive given that no other relief was granted for the alleged denial of access. Because we are remanding for further consideration of the proper amount of fees, we need not and should not address this issue. *See generally Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998) (noting prohibition against advisory opinions).

443 S.W.3d at 877, 891; *see also Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 792 (Tex. 2014) (interpreting *Ritchie* as applying to current statutory law even though it was decided under previous version of statute).[22]  Because of this clarification of the law, the trial court's buy-out order must be reversed.  Additionally, we must determine whether to render judgment on this cause of action or remand for additional proceedings in the trial court.

In *Ritchie*, the supreme court reversed the judgment ordering a buy-out based on the plaintiff's shareholder oppression claims and remanded solely for a determination of whether the plaintiff was entitled to a buy-out order based on her breach of fiduciary duty cause of action.  443 S.W.3d at 891-92.  The court explained that ordinarily when it announced a new legal standard, it would consider remanding for a new trial based on the new standard, but in the case before it, remand of the shareholder oppression claims was not necessary because the plaintiff had sought only a buy-out and had not requested the appointment of a rehabilitative receiver as alternate relief.  *Id.* at 871-72 & n.19-20.[23]  Here, however, Jones did plead for appointment of a receiver under section 11.404 of the Code as one of the possible remedies.  Thus, the limitation on remedies mentioned in *Ritchie* is not present in this case.

Appellants nonetheless urge that a remand for consideration of other relief is not necessary here because, viewed in light of the new standards for shareholder oppression claims set forth in *Ritchie*, the evidence presented at trial is legally insufficient to

---

[22] As the court discusses in *Ritchie*, although the supreme court had not previously addressed the proper scope of shareholder oppression claims and remedies, Texas courts of appeals had for some time permitted common law causes of action and court-ordered buy-outs as a remedy.  443 S.W.3d at 864-65, 877 & n.33.

[23] The plaintiff in *Ritchie* had requested appointment of a liquidating receiver under another part of the statute, but as the court explains, oppressive actions are not a ground for appointment of a liquidating receiver and the elements supporting such appointment were not submitted to the jury.  443 S.W.3d at 872 & n.20.

support the jury's findings and the trial court's judgment.[24] The difficulty with this argument is that Jones prepared his case and presented his evidence without the benefit of knowing that the standard for proving shareholder oppression would change post-verdict. In *Natural Gas Pipeline Co. of America. v. Justiss*, the supreme court explained that it was not uncommon to remand a case to the trial court when the applicable law has changed or evolved between the time of trial and the disposition of the appeal. 397 S.W.3d 150, 162 (Tex. 2012). In the face of a legal sufficiency challenge, the court in *Justiss* remanded instead of rendering because the losing party on appeal may have relied on prior precedent in presenting its evidence. *Id*.

Here, for example, Jones may have discerned no need to present evidence regarding whether appellants' actions were justified under the business judgment rule, which typically was not applied in shareholder oppression cases prior to *Ritchie*. 443 S.W.3d at 865-66 (discussing *Davis v. Sheerin*, 754 S.W.2d 375 (Tex. App.—Houston [1st Dist.] 1988, writ denied), "the seminal Texas opinion" on shareholder oppression prior to *Ritchie*), 868-69 (holding business judgment rule applies in shareholder oppression cases).[25] Accordingly, we sustain appellants' sixth issue to the extent they seek reversal of the trial court's buy-out order, but, in the interest of justice, we remand

---

[24] The *Ritchie* court stated that

> a corporation's directors or managers engage in "oppressive" actions under . . . section 11.404 when they abuse their authority over the corporation with the intent to harm the interests of one or more of the shareholders, in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the corporation.

443 S.W.3d at 871.

[25] We additionally note that in *Hughes*, a per curiam opinion following *Ritchie*, the supreme court reversed the judgment based on shareholder oppression and, in the interest of justice, remanded to permit the plaintiff an opportunity to pursue other claims that may have provided the same relief. *Hughes*, 436 S.W.3d at 792-93. We decline to speculate regarding which of Jones's shareholder oppression allegations, if any, might pass muster under the new standard or whether Jones might have other claims or remedies he could pursue. *See Patterson*, 971 S.W.2d at 443.

34

Jones's shareholder oppression claims for further proceedings in keeping with this opinion and recent supreme court precedent.

## G. Attorney's Fees for Breach of Contract

In their seventh issue, appellants contend Jones was not entitled to attorney's fees for breach of contract because appellants committed no breach of contract. As discussed above in regards to appellants' first issue, the evidence was legally and factually sufficient to support the jury's finding that appellants did in fact breach the 1996 EA. Accordingly, we overrule appellants' seventh issue.[26]

In issue eight, appellants contend that the trial court erred in awarding attorney's fees to Mrs. Jones, who had filed an intervention that was subsequently nonsuited. However, no such award appears in the trial court's final judgment. Although the trial court awarded Jones his reasonable and necessary attorney's fees for appellants' breach of the 1996 EA, the court did not provide any affirmative relief to Mrs. Jones.

To the extent appellants seek under this issue to challenge the amount of the fees awarded to Jones, they have not established that the trial court erred in making the award. An award of attorney's fees must generally be supported by evidence that the fees were both reasonable and necessary. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991), *modified on other grounds by Chapa*, 212 S.W.3d 299. A trial court has discretion to fix the amount of attorney's fees, but it does not have discretion to deny attorney's fees entirely if an award of fees is required under the terms of the parties' agreement or by statute. *Hassell Constr. Co. v. Stature Commercial Co.*, 162 S.W.3d 664, 668 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Appellants point out that in the affidavit the Joneses' attorney filed in support of his fees, he stated

---

[26] In their original brief, appellants additionally argued that Jones was not entitled to attorney's fees because he had not proven presentment as required under chapter 38 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code §§ 38.001-.002. Appellants expressly withdrew this argument in their reply brief.

that "Plaintiff and Intervenor have incurred and paid" a certain amount in legal fees.[27] According to appellants, this statement indicates that the amount requested by the Joneses' attorney included fees charged for doing work that accrued only to the benefit of Mrs. Jones's intervention. However, beyond this one ambiguous statement, appellants point to no indication in the record that the requested fees included any amount for work that accrued only to Mrs. Jones's benefit. The Joneses' attorney additionally pointed out in his affidavit that at all relevant times, the interests of Dr. and Mrs. Jones were aligned in the litigation. Moreover, he provided voluminous, detailed billing records to the court, and appellants do not cite a single item in the billing as a charge accruing solely to Mrs. Jones. Accordingly, we find no merit in appellants' arguments concerning the award of attorney's fees on the breach of contract cause of action. We therefore overrule their eighth issue.

## III. Jones's Cross-Issues

### A. Breach of the 2002 MA

In his first cross-issue, Jones challenges the jury's findings that he failed to comply with the 2002 MA and, because of his failure to comply, TENT suffered damages of $286,071.89, which represents "Jones'[s] proportionate share of all fixed and contingent liabilities."[28] Again, because of the broad form jury submission, we do not know exactly what action by Jones the jury found violated the 2002 MA. In its appellate briefing, TENT urges that Jones breached the 2002 MA by not paying his

---

[27] The attorney stated that a total of $561,204.45 had been incurred but approximately 20% of that was for work in connection with the shareholder oppression claim. Eighty percent of the total figure equals $448,963.56. The trial court awarded Jones $448,936.56 in attorney's fees. It is unclear why there is a $27 difference in the numbers.

[28] In considering this cross-issue, we utilize the same standards governing sufficiency of the evidence and construction of contracts as set forth in the discussion above regarding appellants' alleged breach of the 1996 EA. *See, e.g., City of Keller*, 168 S.W.3d at 822, 827; *Cain*, 709 S.W.2d at 176; *Heritage Res., Inc.*, 939 S.W.2d at 121; *Zurich Am. Ins.*, 157 S.W.3d at 465.

proportionate share of all fixed and contingent liabilities as required under Article IV(A).[29] Article IV(A) provides that

> [i]n the event of a transfer pursuant to Article III (A), 2, 5, 6, 8, 9, or 10, the former Member shall remain liable and shall indemnify and hold harmless the Medical Group and all Members for the former Member's Proportionate Share of all fixed and contingent liabilities as well as Practice Expenses as allocated pursuant to the Physician Employment Agreement until such time as the Medical Group obtains a replacement licensed physician for the former Member.

However, this provision would be triggered only "[i]n the event of a transfer" of Jones's membership interest. As discussed in detail above, the jury found that Jones was still a member of TENT at the time of trial, and the evidence is legally and factually sufficient to support that finding. Therefore, Article IV(A) would not have applied to Jones.

As set forth above, TENT claims to have purchased Jones's interest in accordance with the procedures outlined in Article III(A) of the 2002 MA, which require notice of TENT's intent to exercise its right of first refusal, payment, and a closing. As stated, the evidence was sufficient to demonstrate that TENT neither provided the requisite notice nor paid Jones for his interest, and there is no indication that a closing occurred. Citing Texas Rule of Civil Procedure 54, however, TENT asserts that it was excused from proving notice because (1) notice was a condition precedent to TENT's recovery under Article IV(A), (2) TENT pleaded that all conditions precedent have been performed, and (3) Jones did not specifically deny that notice was given. Tex. R. Civ. P. 54.[30] However, even if TENT is correct regarding notice, as we explain above, the

---

[29] Only TENT, and not the other individual appellants, was awarded damages and attorney's fees for the alleged failure to comply.

[30] Rule 54 provides as follows:

In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred. When such performances or occurrences have been so plead, the party so pleading same

37

evidence was sufficient to establish that no payment or closing occurred.[31]

In its breach of contract claims, TENT specifically alleged Jones failed to comply with the agreements by failing to utilize proper retirement procedures and thus abandoning the medical practice. Article IV(D)(ii) addresses the retirement of a member. It states that

> upon retirement of a Member if the Member shall give the Medical Group at least two (2) years written notice of intent to retire, the Member shall not have any continuing liability for the ongoing liabilities of the Medical Group. In the event the retiring Member shall fail to give at least two (2) years written notice to the Medical Group, the retiring Member shall continue to be liable for the retiring Member's proportionate share of liabilities of the Medical Group for a period of twelve (12) months. Proportionate share shall be the Practice Expenses as defined in Section 1.16 of the Physician Employment Agreement (Shareholder) as applicable to the retiring Member.[32]

---

shall be required to prove only such of them as are specifically denied by the opposite party.

Tex. R. Civ. P. 54.

[31] We held above in our discussion of appellants' issues that appellants waived their Rule 54 argument by not making it in the trial court as a ground for overturning the judgment concerning appellants' breach of the 1996 EA. *See supra* n.15. Because appellants won judgment on Jones's breach of the 2002 MA, waiver would not apply to their Rule 54 argument in response to Jones's cross-appeal. *See generally* Tex. R. App. P. 33.1(a).

To the extent TENT intended to argue that the transfer of Jones's interest to TENT was itself a condition precedent that TENT was excused from having to prove at trial, that issue was tried by consent. *See Cunningham v. Zurich Am. Ins. Co.*, 352 S.W.3d 519, 533 & n.61 (Tex. App.—Fort Worth 2011, pet. denied) (holding that even if certain requirement was a condition precedent that was not specifically denied, it was tried by consent); *Occidental Neb. Fed. Sav. Bank v. E. End Glass Co.*, 773 S.W.2d 687, 688 (Tex. App.—San Antonio 1989, no writ) (holding that even though party failed to plead any noncompliance with conditions precedent, the issue was tried by consent when evidence on the issue was admitted without objection). Although Jones did not specifically deny in his answer that a transfer occurred, he asserted in his own petition that he was still a member of TENT, which could not have been true if he had transferred his interest. Moreover, the question of whether Jones's interest had been transferred was hotly contested at trial and was the subject of a jury question and finding.

[32] As explained above, the members agreed subsequent to execution of the 2002 MA that a

This provision better fits the evidence presented by TENT. The difficulty presented in concluding that Article IV(D)(ii) is the provision the jury found Jones violated (perhaps by not providing proper notice of retirement), however, is that the damages found by the jury are not the same as those permitted by Article IV(D)(ii). Question 15 asked the jury to find the following elements of damages (and no others) for Jones's breach of the agreement:

(a) John Jones' proportionate share of all fixed and contingent liabilities
(b) John Jones' proportionate share of practice expenses
(c) TENT's lost revenue

The jury answered $0 for both practice expenses and lost revenue.

Although Article IV(D)(ii) uses a similar phrase to Article IV(A) and element (a)—i.e., "proportionate share of liabilities"—Article IV(D)(ii) defines this phrase as the applicable practice expenses (defined in turn by a provision of the 2002 EA) for a period of twelve months *after* retirement. In context, "fixed and contingent liabilities," as permitted under Article IV(A) and found by the jury, contemplates debt on which TENT already was obligated. "Practice Expenses," in contrast, contemplates future debts or expenditures over a period of time. To the extent Article IV(D)(ii) could support the award of any specific measure of damages requested in the jury charge, it would be practice expenses, for which the jury entered zero, and not fixed and contingent liabilities.[33] TENT and Jones agreed to the result of a failure to provide proper retirement notice. *See generally Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 67-68 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (explaining

---

retiring member was required to give only one year's notice.

[33] The exact dollar figure found by the jury as fixed and contingent liabilities is reflected on a TENT invoice to Jones showing his percentage share of a line of credit balance and certain loans. These amounts represent debt accrued before Jones ceased working at the medical practice; they do not represent practice expenses incurred after Jones ceased working at the medical practice.

that when a contract contemplates a specific remedy, a party claiming breach is generally limited to the relief specified).  TENT makes no argument that Jones could be responsible for practice expenses for breach of Article IV(D)(ii).  It only argued for damages as a result of a transfer of interest pursuant to Article IV(A), an event the jury found did not occur.

It is clear that the jury concluded Jones should pay something as a result of his departure.  But it also is clear that the jury's award of damages representing "Jones'[s] proportionate share of all fixed and contingent liabilities" is not supported by the jury's answers to the charge and the evidence in this case.  It was TENT's burden to put on legally sufficient evidence of the proper measure of damages.  *See Haygood v. De Escabedo*, 356 S.W.3d 390, 399 (Tex. 2011); *see also W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988) (holding failure to request jury questions on the proper measure of damages resulted in failure of cause of action).  The jury could not have found Jones violated Article IV(A) of the 2002 MA because that provision is triggered only in the event of a transfer of Jones's membership and the jury found Jones was still a member of TENT as of the time of trial.  If the jury based its breach finding on Article IV(D)(ii), TENT failed to submit jury instructions to support the proper measure of damages under the parties' agreement.[34]  Accordingly, we sustain Jones's first issue and reverse the judgment wherein it awards damages to TENT based on Jones's failure to comply with the 2002 MA.

## B.  Remaining Cross-Issues

In his second issue, Jones contends the trial court erred in awarding attorney's fees to TENT.  Because we reverse TENT's damages as to breach of contract, we also sustain this issue and render a take-nothing as to TENT's award of attorney's fees.  *See, e.g., Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 662

---

[34] TENT does not suggest Jones breached any other part of the 2002 MA.

(Tex. 2009) (explaining that a party cannot recover attorney's fees on a breach of contract cause of action if the party does not also receive a damages award).

In cross-issue three, Jones challenges the trial court's reduction of the buy-out award for shareholder oppression to half of what the jury determined was the fair market value of Jones's share. In cross-issue four, Jones urges that if we reverse the award of ancillary income for appellants' breach of contract, we should make the same award based on the shareholder oppression findings. Both of these issues have been rendered moot by our previous holdings within this opinion. Accordingly, they are both overruled.

## IV. Conclusion

We reverse the portion of the judgment awarding attorney's fees for denial of access against the individual defendants and remand for further consideration of the correct amount to be awarded and for entry of an award against TENT. We reverse the trial court's buy-out order and remand Jones's shareholder oppression claims for further consideration below. We additionally reverse the award of damages and attorney's fees based on Jones's alleged breach of contract and render a take-nothing judgment on those claims. We affirm the remainder of the judgment as modified.


/s/     Martha Hill Jamison
        Justice


Panel consists of Justices Boyce, Jamison, and Donovan.


41